**COMPUTER CARE, Plaintiff,**

v.

**SERVICE SYSTEMS ENTERPRISES, INC. and Larry Aronson, Defendants.**

**No. 90 C 5943.**

United States District Court, N.D. Illinois, E.D.

March 20, 1991.

Jean Maclean Snyder, Joshua W. Yaker, D'Ancona & Pflaum, Chicago, Ill., for plaintiff.

Steven R. Peltin, Richard A. Sloan, Charles A. Valente, Altheimer & Gray, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This action has been heard on the motion of plaintiff Computer Care for a preliminary injunction against defendants Service Systems Enterprises, Inc. ("Service Systems") and Larry Aronson ("Aronson").[1] Both Computer Care and defendants, each

---

**1.** After an earlier hearing, this Court had entered a temporary restraining order ("TRO") in

Computer Care's favor on October 16, 1990.

represented by able counsel, appeared at the preliminary injunction hearing (the "Hearing") and presented evidence—after which counsel have completed their submissions by the filing of post-Hearing memoranda. For the reasons stated in this memorandum opinion and order, which reflects this Court's findings of fact ("Findings") and conclusions of law ("Conclusions") in accordance with Fed.R.Civ.P. ("Rule") 52(a),[2] a preliminary injunction is entered in Computer Care's favor of substantially broader scope than the relief granted by the TRO.

### Findings of Fact

Because two lengthy portions of the factual presentation in Plaintiff's Post–Trial Brief in Support of Its Motion for Preliminary Injunction ("P. Mem.") are accurate in virtually every respect, this Court adopts that presentation as its own. In order that these Findings may be self-contained and that the description of the acts sought to be restrained may conform to Rule 65(d), P. Mem. 1–13 is attached as Ex. 1 and P. Mem. 27–31 is attached as Ex. 2 to this preliminary injunction order. Only these matters set out in Ex. 1 are excluded from this Court's Findings:

1. Although it is true that Riordan prepared and furnished to Service Systems a list of Computer Care's customers (Ex. 1 at 5 and 7 [1340–41]) this Court does not find that to be an actionable violation of Computer Care's rights. It is considered as relevant evidence only regarding defendants' *intent*—their state of mind—when they engaged in the other aspects of copying that *do* constitute infringements of Computer Care's copyright and trade dress and trade secrets.

2. Service Systems' use of false advertising claims, which have ascribed to Service Systems attributes that are true as to Computer Care but are knowingly false as to Service Systems (Ex. 1 at 8, [1341]) do not "deceive customers into believing that their service is Computer Care and not Service Systems" (*id.*). In fact this action is not a "palming off" case in that sense. Instead such activity is unfair competition that, whether or not actionable under Lanham Act § 43(a) (15 U.S.C. § 1125(a)), violates Illinois law.

This Court also makes several additional Findings based on the evidence adduced during the Hearing. Those may be set out in relatively brief compass.

For one thing, Computer Care sought unsuccessfully—through many (fully 12) efforts by a professional process server—to subpoena two other persons known to be Services Systems sales representatives (Ex. 1 at 13 [1343]). Both of them were unquestionably ducking service—Aronson himself cynically indicated that to the process server (*id.*). This Court has accordingly drawn the inference that the testimony of those sales representatives as to Service Systems' past and current conduct of its business, and particularly as to the continuing infringement of Computer Care's rights by that conduct, would have been unfavorable to Service Systems and hence favorable to Computer Care.

Second, the changes that are manifested in Service Systems' currently produced sales scripts—which appear to have deleted the direct misrepresentations that originally misappropriated Computer Care-related facts for Service Systems' benefit—are not sufficient under the circumstances to dispel the overall pattern of copying and misappropriation involved here.[3] Although Fed. R.Evid. 407 bars the admissibility of subsequent remedial measures "to prove ... cul-

---

**2.** To the extent (if any) the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings.

**3.** This is even apart from the unsatisfactory showing by Service Systems that it has fully abandoned all direct misrepresentations. As already stated, the ducking of service of subpoenas by Service Systems' sales representatives— the persons who actually make the presentions to prospective customers—would justify an adverse inference as to whether such abandonment has truly taken place in practice, as well as the misrepresentations being eliminated from the paper sales scripts.

pable conduct in connection with the event," such activity may of course bear on the propriety of injunctive relief against future violations by Service Systems. In this instance the combination of defendants' past culpable activity and the nature of their response to this litigation calls for a total lack of confidence in the noninfringing nature of their future conduct unless Computer Care is given the assurance that can be provided only by an injunction order.

Third, any suggestion by Feldgreber that Service Systems had developed its materials independently, rather than by copying them from Computer Care virtually lock, stock and barrel, is rejected as incredible. If anything, that unbelievable assertion tends to underscore Service Systems' intention to engage in the deliberate infringements and misappropriations that have been disclosed by the record. Feldgreber's efforts to explain Service Systems' copying of the Computer Care format, as presented in its three types of report, on the basis that what was copied was functional is also wholly unworthy of belief in light of Kaufman's testimony to the contrary. All that Feldgreber rather demonstrated was that the presentation and format *could* be set up as Computer Care did, and as Service Systems copied, in order to serve customers—but not at all that the presentation and format *had* to be done that way in order to perform the function.[4] Dramatic evidence of the non-functionality of that information is provided by the facts (1) that Computer Care's own more recent reports do not include some of its aspects and (2) that the new Mopar Customer Care program, being presented pursuant to a con-

tract with (but not being provided directly by) Computer Care, will employ a different format.

Fourth, although Computer Care's trade secrets may not be entirely as broad as it seeks to claim in that respect, Kaufman's testimony established that various matters that he had designed in the Computer Care system and that were kept closely under wraps (not known even to Computer Care's sales manager)[5] were matters of which Riordan was aware. It is a reasonable inference, and this Court finds, that Service Systems' incorporation of those same unique factors into its modus operandi—factors highly important to the commercial success of the operation—were derived through the imparting of those confidential trade secrets from Riordan to Aronson.

### Conclusions of Law

■ All the relevant criteria for issuance of a preliminary injunction are the same as the preconditions to issuance of a TRO, as outlined in the TRO in this case. But because the scope of the preliminary injunction called for in this case is broader than that of the TRO, it is necessary to recapitulate those criteria (again drawing on their explication in *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984)) and to apply them to the situation disclosed in the Hearing. To make these Findings and Conclusions self-contained, this Court will copy or borrow freely from portions of the TRO. Accordingly it turns to the legal reasons that the preliminary injunction granted here is both necessary and appropriate.

---

4. Indeed, after Computer Care had put out the promotional piece that contained photographic copies of its three types of report, it modified those reports to eliminate some information that Kaufman considered unnecessary (and that was thus nonfunctional by definition). Yet the Service Systems report forms *included* that nonfunctional and surplus information, confirming its slavish copying from Computer Care's material and giving the lie to Feldgreber.

5. Those matters, set out in Ex. 2, included such items as the large number and specific identity of the car repair services that Computer Care used to trigger its follow-up system, the ability

to use adjustable service cycles, the nonuse of license plate or VIN numbers (something that casual observation and the uniform practice elsewhere throughout the car repair business would suggest should be used as a matter of course), the automatic follow-up mailing to a nonresponding car owner, coupled with the automatic elimination of a car owner from such follow-up mailings after the owner's failure to respond to two successive repair cycles, and the automatic addition of every new repair customer of any car dealer to that dealer's data base for the computer-program follow-up procedure.

*Lack of an Adequate Remedy at Law*

*Roland Machinery,* 749 F.2d at 386 teaches the centuries-old wisdom that a plaintiff must establish the absence of an adequate remedy at law as a precondition to any form of equitable relief. By its very nature, a claim of invasion of intellectual property such as a trademark or trade dress or trade secrets demands injunctive relief if the value of that property is not to be destroyed by the alleged infringer. And the need for such injunctive relief is the paradigmatic example of the absence of an adequate remedy at law.

*Irreparability of Harm*

■ *Roland Machinery, id.* says "[t]he requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait until the end of trial to get that relief." As applied to a trademark infringement case, *Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153, 1158 (7th Cir.1984), quoting from this Court's opinion in *Instrumentalist Co. v. Marine Corps League,* 509 F.Supp. 323, 332 (N.D.Ill.1981), confirms that the effect on the trademark owner's business if the infringement is permitted to go unchecked conclusively demonstrates the irreparability of the harm sustained. This presumption of irreparable harm holds equally true in cases of trade dress infringement (*A.J. Canfield Co. v. Vess Beverages, Inc.,* 612 F.Supp. 1081 (N.D.Ill. 1985), aff'd, 796 F.2d 903 (7th Cir.1986)). And the same concept applies to the misappropriation of trade secrets (cf. *AMP Inc. v. Fleischhacker,* 823 F.2d 1199, 1206–07 (7th Cir.1987)).

*Likelihood of Success on the Merits*

Computer Care has demonstrated a substantial probability—far more than the "better than negligible" chance that *Roland Machinery,* 749 F.2d at 387, sets as a floor requirement—of prevailing on the merits of this action, and specifically on the merits of its claims that:

1. Service Systems' trade dress, especially as embodied in Service Systems' sales brochures and its reminder letters, infringes Computer Care's rights in its own trade dress.

2. Service Systems' incorporation into its system of the elements that are an important key to the success of this business—the already-described elements (see n. 5 and, for a more detailed statement, Ex. 2) that were developed by Kaufman and have not been disclosed to Computer Care's salespeople or customers—are protected trade secrets and have been improperly obtained and utilized by Service Systems.

This Court's review of copies of Computer Care's trade dress and Service Systems' trade dress and the evidence received at the Hearing leads it to conclude that there is more than a very substantial probability that Service Systems has infringed Computer Care's protected trade dress rights. In that respect, see such cases as *Roulo v. Russ Berrie & Co.,* 886 F.2d 931 (7th Cir. 1989).

As for the trade secrets issue, since the Hearing our Court of Appeals has handed down an important decision fleshing out that concept, explaining the policy reasons for their protection and rejecting the wooden approach to security measures that had too often caused trade secret claimants to lose their right to legal protection (see *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.,* 925 F.2d 174, 177–80 (7th Cir.1991)). Portions of the *Rockwell Graphic* opinion might well have been written for this case, providing a graphic [6] illustration of the reasons that Computer Care is entitled to broad protection against Service Systems' infringement here. Indeed, *Rockwell Graphic, id.* at 176–77 expressly holds that the owner of trade secrets does not forfeit protection for information that *is* secret by "overclaiming" the scope of its trade secrets out of an abundance of caution.

---

**6.** Bad pun intended.

### Balancing of Relative Harms

*Roland Machinery*, 749 F.2d at 387–88 teaches the application of a "sliding scale" approach, under which (*id.* at 387):

> the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.

In the balancing process, the relevant comparison is between the harm that the moving party would suffer from the wrongful denial of a preliminary injunction (or a TRO) as against the harm that the defendant would sustain if such preliminary injunctive relief were wrongfully granted (*id.* at 388). In this instance that balance weighs heavily in Computer Care's favor.

It is true that the preliminary injunction granted here will deprive Service Systems of the benefit of the service contracts that it has obtained through its marketing of a system derived from poaching on Computer Care's preserves. It is also true that Service Systems will not be able to re-enter the business without demonstrating that it is doing so with an independently-created format and method.[7] And those things could create material harm to Service Systems if the preliminary injunctive relief proved to have been wrongfully granted.

But on the other side of the coin, if a preliminary injunction were wrongfully denied to Computer Care it would confront the problem that this Court described in *Instrumentalist*, 509 F.Supp. at 333 and that was later quoted by our Court of Appeals in *Hyatt Corp.*, 736 F.2d at 1158:

> [T]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who don't knock on the door or to identify the specific persons who do not [return] because of the existence of the infringer.

If there is any difficulty in quantifying the loss on either side because the loss of good will would have to be measured in damages rather than avoided by injunctive relief,[8] the balancing of harms must be viewed as coming down in favor of the party such as Computer Care, which was clearly first in the field and unquestionably developed its own operation and methodology independently.

What this discussion teaches is that *both* components of the sliding scale taught in *Roland Machinery* tip substantially toward Computer Care. Thus that precondition to preliminary injunctive relief is also satisfied.

### Public Interest

No public interest is disserved by the entry of a preliminary injunction in this case. *Roland Machinery, id.* at 388 identifies the "public interest" in terms of any "consequences beyond the immediate parties." In this instance the unrepresented third parties are the consuming public in general. Based on the evidence at the Hearing, the public surely ought to be protected against the potential or the actuality of purchasing or using services from Service Systems that are infringing and that are sold under false auspices in the marketplace.

\*     \*     \*

It is therefore ordered, adjudged and decreed that:

1. This Court has jurisdiction over the subject matter and over the parties to this action.

2. There is a high likelihood that Computer Care is the owner of the protected trade dress identified in the Complaint and consisting of sales brochures titled "Win or Lose" and the Computer Care Reminder Letters. There is also a high likelihood that Computer Care's trade dress is arbi-

---

7. That could, of course, include elements generally known and employed by others—even elements of Computer Care's business operation that are truly functional and are not elements of its protected trademarks, trade dress or trade secrets. Service Systems would not have to reinvent the wheel entirely.

8. Whether a preliminary injunction turned out to be wrongfully granted or wrongfully denied, the party that had lost at the preliminary stage but prevailed at the end of the litigation would be relegated to a money recovery to make good what it had suffered in the interim.

trary and distinctive, giving Computer Care the exclusive right to use the trade dress in commerce in connection with the type of service it provides. And there is also a high likelihood that the methodology employed by Computer Care in its service program—internal matters not disclosed to its salesmen or other employees, or to its customers, and critical to the value and success of its business—involves trade secrets that are unique to Computer Care.

3. Aronson and Service Systems and each of his or its principals, officers, agents, servants, employees, attorneys and affiliated companies or enterprises, and all persons in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, are hereby enjoined from:

(a) continuing to operate Service Systems' business by utilizing any but the second of the seven elements described in Ex. 2 to this Order, all of which are part of the Computer Care trade secrets critical to the value and success of its business;

(b) using, in any manner whatsoever, the following:

(1) the current sales brochure titled "Maintain or Fail"; instead Service Systems may use only advertising, promotional materials and sales brochures employing a trade dress substantially different from those employed by Computer Care;

(2) the previous reminder letter containing the right-angled logo and the current reminder letter containing the blue stripe, such reminder letters also being distinguished by a manufacturer's logo printed in blue in the upper right-hand corner; the distinctive blue color of the logo; the dealer's phone number appearing twice on the letters; the letter's sign-off bearing the first names of people at the dealership followed by the dealer's name; the dealer's special included in the blue bar across the stationery; the print of the letters appearing in a type face identical to Computer Care's; the size of the stationery identical to Computer Care's; and the use of a window envelope; instead, Service Systems may use only reminder letters or cards employing a trade dress substantially different from that employed by Computer Care;[9]

(3) the present computerized reports called Repair Order Analysis, Service Schedule and Service Systems Monthly Report; instead, Service Systems may use only reports (computerized or otherwise) employing a trade dress substantially different from that employed by Computer Care;[10]

(c) continuing to deal with customers under any contract obtained or maintained through the use of any of the trade secrets referred to in Paragraph 3(a) or the prohibited materials referred to in Paragraph 3(b).

4. Service Systems and Aronson are ordered on or before April 10, 1991 to deliver to all existing Service Systems customers a notice of this Order, in a form to be approved in advance by this Court.

5. On or before April 24, 1991, Aronson and Service Systems are ordered to file with this Court and to serve on Computer Care's counsel a report in writing, under oath, setting forth in detail the manner of their compliance with this Order.

9. This should not be misread as prohibiting Service Systems, if it otherwise complies with the provisions of this Order, from employing a combination of the elements referred to in this Subparagraph 3(b)(2) that in the aggregate present a substantially different trade dress. To avoid the potential for further dispute after Service Systems has developed a system in compliance with Paragraph 3(a), Service Systems is authorized to move for a declaration of compliance from this Court.

10. This should not be misread as prohibiting Service Systems, if it otherwise complies with the provisions of this Order, from employing reports that embody and are presented so as to incorporate the numerous functional aspects of such reports (cf. *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 608 (7th Cir.1986)) and in the aggregate present a substantially different trade dress. Again as in n. 9, Service Systems need not operate at its peril.

EXHIBIT 1

In the United States District Court for
the Northern District of Illinois
Eastern Division

Computer Care, a New York partnership,

Plaintiff,

v.

Service Systems Enterprises Inc., an
Illinois corporation, and LARRY
ARONSON, individually,

Defendant.

No. 90 C 5943

Judge Milton I. Shadur

I. STATEMENT OF FACTS

Filed Dec. 27, 1990

Computer Care provides computerized follow-up of car repair customers to generate business for its customers—car dealerships and other businesses that repair cars. (Kaufman direct). Computer Care has provided this service since 1977 to customers across the country; today it has approximately 2000 customers, most of whom are car dealerships. Computer Care is a general partnership organized and operating in Amityville, New York. Robert Kaufman of Dix Hills, New York, is a 90% owner; his father, Irving Kaufman of Wayne, New Jersey, is a 10% owner. Robert Kaufman ("Kaufman") is president of Computer Care and runs

[Page 2]

its day-to-day operations; Werner Schmitt ("Schmitt") is Computer Care's national sales manager. (Kaufman direct).

In April 1989, Computer Care hired its first sales representatives for the Chicago area. One representative was Patrick Riordan ("Riordan"), who had worked off and on for Computer Care for more than 12 years and whom Kaufman considered a personal friend. The other man was Pat O'Rourke ("O'Rourke") a friend of Riordan's. (Kaufman direct, Riordan direct and cross).

Riordan worked for Computer Care in Chicago until February 1990, when he left to move to Massachusetts (although in June 1990, he returned to Chicago to attend a sales meeting on Computer Care's behalf). (Kaufman direct). O'Rourke worked for Computer Care until mid-September 1990, when Kaufman fired him. (Kaufman direct, Riordan direct). Beginning in late 1989 and continuing until at least early 1990, O'Rourke and Riordan worked actively with defendant Larry Aronson ("Aronson") and Service Systems vice-president William Feldgreber ("Feldgreber") to set up a system based on Computer Care to compete with Computer Care. (Riordan direct, Nitch direct).

In May, 1990, Computer Care learned that it had a competitor in the Chicago area. Because O'Rourke and Riordan lied to Kaufman about their role with this competitor, Computer Care did not learn the full true facts until mid-September 1990. At that time, it knew the following facts: Aronson had set up a competing business in Chicago called Service Systems based solely on information it had obtained from Riordan and O'Rourke. The

[Page 3]

competing business had copied—without a trace of ingenuity—Computer Care's reminder letters; its "Win or Lose" brochure; and its three computerized reports, The Workdue Schedule, The Transaction Analysis, and The Profit Builder Response Analysis. All these documents have been used by Computer Care for many years; Computer Care believes that they have come to be associated with Computer Care in the minds of customers. (Kaufman direct).

Computer Care also learned that, while they were working for Computer Care, Riordan and O'Rourke had met with Aronson, Service Systems' founder and president, and given him all the materials and information essential to running Computer Care's business, including an audio tape of Schmitt giving a Computer Care sales presentation. (Riordan direct, Nitch).

Upon learning these facts, Computer Care filed this lawsuit on October 12, 1990. A temporary restraining order was entered on October 16, 1990, prohibiting Service

Systems and Aronson from using their reminder letters (except for an October mailing that they had testified was then in process), from using their "Maintain or Fail" brochure, and from using any Computer Care customer list. Despite this injunction, defendants continued to distribute the reminders letters to customers as part of their standard routine, just as they always had. (Feldgreber direct, Streicker Transcript, pp. 52, 55, and 56).

On December 14, 17, and 18, 1990, a hearing on Computer Care's motion for preliminary injunction took place. At that

[Page 4]

hearing, Computer Care presented live testimony from Kaufman, Nitch, Riordan[2], and Robert Moler ("Moler"), a process server whom Computer Care had engaged to serve subpoenas on Aronson, Feldgreber, and the Chicago area Service Systems sales representatives. Computer Care also examined Aronson and Feldgreber as adverse witnesses and introduced the deposition testimony of Service Systems sales representative Ned Streicker. Service Systems and Aronson rested without calling any witnesses. Nor did defendant Aronson or Feldgreber testify in their own behalf.

Evidence adduced at the preliminary injunction hearing shows that in late 1989 Riordan, O'Rourke, Aronson and Feldgreber formed a handshake partnership in which the four of them were to set up Service Systems. In connection with setting up Service Systems, Riordan gave Aronson and Feldgreber Computer Care's reminder letters, its brochures, copies of its computerized reports, and other materials that Computer Care sales representatives make available to customers. (Nitch direct, Riordan direct).

Over the months Riordan, who was intimately familiar with the details of Computer Care's operations—including confidential information about the structure of the system that was not shared with others—had

as many as 10 face-to-face conversations with

[Page 5]

Aronson and/or Feldgreber about Computer Care and as many as 10 telephone conversations. (Kaufman direct, Riordan direct). Some of these conversations also included discussions about Aronson's other business, Win–A–Trip, a magazine designed to solicit advertising (for which Riordan also was working). (Riordan direct).

In explaining Computer Care's system to Aronson, Riordan began with the basics because the business was totally unfamiliar to Aronson. (Riordan redirect). In their many discussions he and Aronson talked about pricing information, sales techniques, and "where we were going tomorrow." In addition, they talked about the Computer Care materials that Riordan gave Aronson, and Riordan delivered a Computer Care sales presentation to Aronson and Feldgreber. (Riordan direct and redirect).

Also in connection with setting up Service Systems, Riordan prepared a customer list that Aronson knew consisted of Riordan's Computer Care contacts, so that everyone working for Service Systems would know which customers Service Systems should stay away from. (Riordan direct). On December 8, 1989, and January 26, 1990, O'Rourke and Riordan signed up Service Systems' first customers. (Riordan direct, Pl.Ex. 6 and 7). In early 1990, Service Systems sent out its first reminder letter; three or four months later, it sent out its first computerized reports. (Aronson direct, Feldgreber direct).

Thomas Nitch ("Nitch") went to work for Computer Care in May 1990 as a sales representative (at that time, O'Rourke also was a

[Page 6]

Chicago-area Computer Care sales representative.) (Kaufman direct). In July, Aronson asked Nitch if he would work for Service Systems. In attempting to win

---

**2.** Defendants have suggested that Computer Care and its lawyer promised Riordan money—perhaps "substantial sums"—in return for his testimony. Riordan denied the claim, as do Computer Care and its lawyer, to the extent that such an insulting suggestion needs a response. (Riordan cross and redirect)

Nitch over, Aronson pointed out that Nitch would no longer have to put up with any competition if he worked for Service Systems. He also boasted that he had copied his program from Computer Care, getting information from current or former Computer Care employees. Wooing Nitch with a salary of $1500 per week in addition to commissions (his sole compensation at Computer Care consisted of commissions), Aronson eventually persuaded Nitch to come aboard. (Nitch).

Nitch informed Kaufman that he was leaving and went to work for Service Systems in late July 1990. After less than a week, Nitch quit; and asked Kaufman if he could return to work for Computer Care; eventually Kaufman said yes, and Nitch returned for a salary of $600 per week plus commissions. (Nitch direct, Kaufman direct). Nitch left Service Systems because he learned that its computerized reports were unusable. In fact, they were so riddled with errors that Aronson, Feldgreber, and Simon agreed that they were unusable. (Nitch direct). On August 1, 1990, the Service Systems representatives promised to correct the problems in the reports over the weekend, but reports prepared at the end of August likewise were filled with obvious errors. (Nitch direct, Pl.Ex. 26).

Eventually the arrangement among Riordan, O'Rourke, Feldgreber and Aronson broke down, but Feldgreber and Aronson

[Page 7]

continued to set up Service Systems without their former partners. (Aronson direct).

While obtaining Computer Care's information and materials from Riordan and O'Rourke, Aronson knew that Riordan and O'Rourke were agents of Computer Care. (Riordan direct).

Some of the information Aronson obtained from Riordan was confidential, including Computer Care's know-how and information about the structure of the system and also a confidential customer list that Riordan prepared specifically for Service Systems. (Kaufman direct, Riordan direct, Pl.Ex. 5). This information is sufficiently secret to derive economic value, ac-

tual or potential, from not being generally known to other persons who can obtain economic value from its disclosure and use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. (Kaufman direct).

The pervasive errors in Service Systems' reports harm the reputation of Computer Care because Service Systems' reports mimic Computer Care's reports and because the overall systems of the two companies are, except for the errors, substantially similar. (Nitch, Kaufman direct). As further evidence of this harm, Computer Care has heard from customers who are disenchanted with Service Systems' business but afraid to try Computer Care's services because they seem so similar. (Nitch direct, Kaufman direct).

[Page 8]

Computer Care's reputation also is harmed because of the rumors being spread—some of them by Aronson—that he enticed away Computer Care's agents to work for him. (Kaufman direct).

In its sales presentations to potential customers, Service Systems representatives makes false advertising claims that deceive customers into believing that their service is Computer Care and not Service Systems. In particular, they falsely state that they are part of a test that Chrysler Corporation did using Computer Care's program which demonstrated that Computer Care's services successfully generated business, and also falsely state that they represent thousands of dealers and have done so for a long time, when in fact Service Systems represents less than one hundred dealers and has been in business for a short time. (Aronson direct, Nitch direct, Pl.Ex. 10, 25 and 25A).

Service Systems also has copied all the documents that are essential to Computer Care's business, including the Computer Care Reminder Letters; the three Computer Care computerized reports called the Profit Builder Response Analysis, the Workdue Schedule, and the Service Schedule; and the Computer Care sales brochure

titled "Win or Lose." (Pl.Ex. 16, 17, 18, 26, 27, and 28). The evidence shows that Service Systems' documents are confusingly similar to the inherently distinctive and nonfunctional format, design, and total image of Computer Care's documents.

Further, after receiving from Riordan Computer Care's confidential information including information about the

[Page 9]

structure of Computer Care's system, Aronson and Service Systems used this information to set up the Service Systems' program. (Kaufman direct, Riordan direct, Nitch).

[Page 10]

Evidence adduced at trial establishes that—despite their representations to the contrary—Aronson and Service Systems have promoted their business through false advertising. Defendants' false statements are intended to deceive potential customers into believing that Service Systems has a record of experience, customer satisfaction, and successful performance substantiated by objective evidence. Service Systems has no such record; that solid track record in fact belongs to Computer Care.

Service Systems and Aronson's false advertising has included the following statements:

(a) Service Systems has "hundreds of auto dealers" and "dealers all over the country" using its services. (Aronson direct, Nitch direct, Pl.Ex. 20 at 5, 25, 25A at 2). Service Systems has made this false statement since July or August 1990. (Nitch direct, Streicker Trans., 12). Defendants now have admitted that this statement is false (Aronson direct); the truth is that Service Systems is a start-up company in the Chicago area that even in December

[Page 11]

1990 had only one hundred dealers as customers. (Aronson direct).

(b) Service Systems has been in business "more than a dozen years." (Pl.Ex. 8 at 20). The truth is that Service Systems signed up its first customer in December 1989, sent out its first reminder letter in early 1990, and sent out computerized reports for the first time three to four months later. (Aronson direct, Feldgreber direct). Moreover, in a sales pitch given in August 1990, in which the facts were less distorted but nevertheless false, Aronson told a potential customer that he had been in business more than a year. (Nitch Direct).

(c) Service Systems has "done work for Chrysler." (Nitch direct and cross, Pl.Ex. 24). The fact is that Service Systems has never had any relationship with Chrysler Corporation. (Aronson direct, Nitch direct, Kaufman direct).

(d) Chrysler Corporation did a test using Service Systems' program that substantiated the effectiveness of that program. (Pl.Ex. 10 at 25, 25A at 18). In reality, Chrysler Corporation did such a test with Computer Care, not with Service Systems. (Aronson direct, Kaufman direct).

All these statements are false. Despite his earlier declaration to the contrary, Aronson admitted their falsity at the preliminary injunction hearing, and defendants have offered

[Page 12]

no explanation or justification for Aronson's lies. (Aronson direct).

Although false as to Service Systems, the advertising claims all do truthfully apply to Computer Care. Founded in 1977, Computer Care has about 2000 car dealers as customers who are scattered across the country. (Kaufman direct and cross). Computer Care thus has "hundreds of auto dealers as customers" and has been in business for "more than a dozen years." Further, Chrysler did a test using Computer Care's program and Computer Care has a special program with Chrysler called the Mopar program (Kaufman direct), so that Computer Care "has done work for" Chrysler.

The evidence shows that these false claims were a standard part of the Service System presentation—as well they might be since they falsely made it appear that

Service Systems was a stable, reliable, substantial company. These false advertising claims painted over the unflattering truth—that Service Systems has been in business less than a year and that even in August it was producing computerizing reports so flawed the Service Systems' personnel, including Aronson, Simon and Feldgreber, agreed that the reports were unusable. (Nitch direct).

Evidence showing that these claims were made includes firsthand testimony and circumstantial evidence. Nitch testified that he watched Aronson (who Nitch said made about 80 percent of Service Systems' sales presentations) give a sales presentation in which he's boasted that Service Systems had been in business

[Page 13]

for more than one year and had serviced dealers across the country. (Nitch direct and cross).

Other evidence shows that the false claims were part of the standard sales pitch that Service Systems sales representatives were required to memorize. This conclusion follows from several sources: First, Nitch testified that when he worked for Service Systems in late July 1990, Aronson gave him a script that contained these false statements. (Nitch direct). Nitch's recollection is buttressed by documentary evidence: an audiotape he had made of the sales pitch Aronson gave him (Pl.Ex. 25 and 25A) records some of the statements and a draft of a letter Nitch wrote in September (Pl.Ex. 21, 24) record others. Further, the sales script of Service Systems sales representative Streicker (which Streicker was told to memorize) contains statements about Service Systems' "hundreds of dealers" and its "many years" of experience, and tells customers that "Chrysler did a 50 dealer test using this program." (Pl. 10, pp. 5, 25, Streicker Transcript, p. 12).

The conclusion also must be that the testimony of two other Service Systems' sales representatives, Laura Wool and Yale Allen, would have confirmed the pervasiveness of defendants' false advertising. Al-

though Computer Care subpoenaed these people and although Computer Care's process server Moler made a total of 12 attempts to serve them, service was unsuccessful. Moler learned why when Aronson told him that Ms. Wool would not be out of her house until the litigation had concluded and smilingly admitted that Allen "had been known" to be at home.

## EXHIBIT 2

[Page 27]

Computer Care's program and methods are protected trade secrets too. The uncontroverted evidence shows that Computer Care has expended substantial effort and money in developing its know-how, that it gains commercial advantages from these secrets not being made available to the public, and that reasonable measures were taken to protect the secrets.

At trial, Kaufman gave testimony based on a chart he had prepared outlining the information which Computer Care considered to be secret "know-how" that had been copied by Service Systems. (Pl.Ex. 30). Kaufman explained each item, how it had been developed through his experience and through trial and error with the Computer Care Profit Builder System, and how the company obtained economic advantage by the fact that these items were not known by competitors. Further, Kaufman testified that many of these features were unknown to important Computer Care employees. Even sales manager Schmitt was not informed of the details of the system which Kaufman had designed primarily by himself. Only because of Riordan's special relationship to Computer Care did he become aware of these matters which he was later able to pass on to Aronson and Service Systems. (Kaufman direct).

First, Kaufman testified that Computer Care was unique in the car repair follow-up business in that it based the triggering of its system on twelve different care repair services, while the competition uniformly triggers one or two basic services such as an oil change. Kaufman used twelve services as triggers because he had seen that

many dealer repair shops were being hurt by the

[Page 28]

proliferation of chain oil change shops and designed his system to trigger off of more substantial services. In addition, Kaufman found that there was a revenue-enhancing effect to the dealers of tracking these more expensive services. Further, since systems that trigger off only one service are still able to remind car owners of many different services, outsiders have no reason to know of Computer Care's. The greater return on investment to dealers that subscribe to the Profit Builder System is the clearest form of economic advantage that a trade secret can provide.

Second, Kaufman testified that he learned over time that Computer Care's mailings were more effective when addressed only using a last name and title. Letters addressed to Mr. Smith would be opened by any male Smith in the household so that more than one person knew that the automobile was due for service. Kaufman testified that he specifically decided to adopt this measure as a business strategy.

Third, Computer Care learned through its experience in the automotive industry that dealers wanted adjustable service cycles. Competitors in the repair follow-up business set specific time or mileage measures after which they send a reminder, usually basing these measures on the manufacturer's service recommendations. Computer Care's experience showed that individual dealers wanted the opportunity to stray from the manufacturer's recommendation; thus, the Profit Builder System was modified accordingly. This modification feature is available

[Page 29]

to dealers who specifically ask for it but is not offered generally; it is therefore secret. The rationale behind this item was Kaufman's and as far as the evidence showed, no other competitor except Service Systems offers the same feature. Computer Care thus obtained economic advantage from this feature's remaining secret.

Fourth, the Computer Care system is not based on license plate numbers or vehicle identification (VIN) numbers. In the automotive repair business the uniform practice is to match up an incoming repair order with the customer based on the license plate number or VIN number. This practice is not followed by other businesses, however. Since Computer Care sought to market itself to oil change and tire shops as well as to car dealers, Kaufman decided not to use the license or VIN number. That decision was known only to Kaufman and those close to him at Computer Care, Riordan being one of those people.

Fifth, the Computer Care system is designed to send its letters for two repair cycles and then stop, putting the name of the non-responding car owner in an inactive status. This procedure was not publicized until the most recent brochure which appeared long after Riordan began having discussions with Aronson and Service Systems. Kaufman testified that other similar systems are plagued by the mushrooming effect of letters being sent to names and addresses of persons that have moved, sold their cars, or died. In order to combat this problem, Computer

[Page 30]

Care instituted the automatic stop, giving its system the marketing advantage of decreased cost.

Sixth, Computer Care designed its system to provide a second reminder letter to the car owner if customers failed to respond to the first. Doing so provided better percentages of owner response and more satisfied dealer customers, thus conferring a business advantage on Computer Care. Salespersons do not make this point on sales calls and such information is not publicly available. Only Kaufman, Riordan, and a few others knew what this feature meant and how it fit into the overall Profit Builder System.

Seventh, experience taught Kaufman and Computer Care that their repair follow-up system had to take account of the great percentage of turnover that exists among persons visiting a specific repair shop. In conjunction with the pruning procedure

mentioned above, the Profit Builder System automatically adds new customers to a dealer's database when a repair order is processed. In contrast, Computer Care's competitors who offer updating of their service do so with respect to the dealer's existing database, adding data only on already-existing customers. Computer Care learned that a proficient follow-up system requires the ability to adjust to the high turnover of a dealer's repair business, and gained an economic advantage by incorporating a feature to accommodate that. This feature is not necessarily explained to prospective customers and was known to just a few persons at Computer Care. Like the other features

[Page 31]

described, this feature is however part of Service Systems' program. (Kaufman direct).

Kaufman also explained that he spent time and money prior to the formation of Computer Care and then during the twelve years of its existence learning the specific needs of the automotive servicing industry so that this knowledge could be incorporated into Computer Care's Profit Builder System. The trial and error process eventually led to information that conferred significant advantages over the competition. The evidence showed that the information was sufficiently secret and that reasonable steps were taken to maintain the confidentiality such that trade secret status exists.

All of the features mentioned above and evidenced by Kaufman's testimony are trade secrets of the know-how type. In addition to those items being individually protected as trade secrets, the Computer Care Profit Builder System, comprised of those components and misappropriated in its entirety by the defendants, is a protected trade secret.