**COMPUTER CARE, Plaintiff–
Appellee/Cross–Appellant,**

v.

**SERVICE SYSTEMS ENTERPRISES,
INC. and Larry Aronson, Defendants–
Appellants/Cross–Appellees.**

Nos. 91–1932, 91–2183.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 25, 1992.

Decided Nov. 20, 1992.

Jean Maclean Snyder (argued), Joshua W. Yaker, Ann H. Theodore, D'Ancona & Pflaum, Chicago, IL, for plaintiff-appellee.

Charles A. Valente, Steven R. Peltin (argued), Richard A. Sloan, Altheimer & Gray, Chicago, IL, for defendants-appellants.

Before CUDAHY, COFFEY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

Computer Care and Service Systems Enterprises, Inc. are both engaged in the auto service "reminder letter" business. These businesses use a computer program to generate letters on behalf of auto dealerships and repair shops reminding car owners when their cars are in need of some service, such as an oil change or a tune up. Computer Care brought this suit against Service Systems alleging that Service Systems had violated section 43(a) of the Lanham Act[1] by infringing the trade dress of Computer Care's reminder letters, sales brochure and monthly reports. The suit also charged Service Systems with making representations in its sales calls that were false as to Service Systems, although true as to Computer Care. In addition, Computer Care claimed that Service Systems had misappropriated certain trade secrets, in violation of state law. The district court granted Computer Care's motion for a preliminary injunction on the trade dress and trade secret claims. The court did not,

1. 15 U.S.C. § 1125(a) (1988).

however, enjoin Service Systems from continuing to make the false representations alleged by Computer Care. Service Systems appeals from the district court's grant of preliminary relief, and Computer Care cross appeals from the court's decision not to grant relief on the false advertising claim. We affirm in part, reverse in part and remand for further proceedings.

## I.

Computer Care was founded by Robert Kaufman, who still runs the company, in 1977. The company now has approximately 2,000 customers nationwide. Most of Computer Care's customers are car dealerships, although the company also services oil change shops and repair shops. Each month Computer Care sends computer-generated letters on behalf of these customers to car owners whose cars are due for service reminding them that work is due. Computer Care also provides its customers (the dealers) with computer-generated reports that show the dealer the amount of business the reminder letters are generating. Once a month the Computer Care representative delivers three basic reports to the dealer: a "Profit Builder Response Analysis," which shows the revenue generated by Computer Care's system; the "Work Due Schedule," which shows the dealer which customers received reminder letters and which services were indicated as being due; and the "Transaction Analysis," which tallies servicing done during the last month by type of service, showing the number of times each service was performed that month. Computer Care also uses a four-page brochure entitled "Win or Lose!" to sell its business to potential customers.

Computer Care entered the Chicago market in June of 1989, when it hired Timothy Riordan and Patrick O'Rourke to act as sales representatives in the area. Riordan, a personal friend of Kaufman, had worked for Computer Care off and on for approximately ten years in other areas of the country. O'Rourke was a friend of Riordan with whom Kaufman was unfamiliar. At the time Riordan became a Chicago sales representative for Computer Care, he was also working for Larry Aronson and William Feldgreber, who later became the president and vice president of Service Systems, selling advertising space in a magazine they published.

At some point, Riordan told Aronson about Computer Care's business. Aronson became interested in starting a similar business. Riordan provided Aronson and Feldgreber with copies of Computer Care's sample reminder letter, its sales brochures, its computer-generated monthly reports, its sales presentation book and other materials that Computer Care sales representatives make available to customers. Riordan also played an audiotape of a Computer Care sales presentation for Aronson, and delivered a presentation to Aronson and Feldgreber. Finally, Riordan supplied Aronson and Feldgreber with a list of customers whom he and O'Rourke had contacted on behalf of Computer Care, to ensure that Service Systems would not call on them.

On December 8, 1989, Riordan and O'Rourke signed up Service Systems' first customers. (Although Riordan and O'Rourke were invited to join the new business, they ultimately declined to do so, and ceased working for Service Systems.) By May of 1990, Service Systems was using a four-page sales brochure called "Maintain or Fail." In June of 1990, Service Systems sent out its first reminder letters to car owners. Shortly thereafter, Service Systems sent its first monthly reports to its customers. Like Computer Care, Service Systems used three reports: a "Service System Monthly Report," which shows the revenue generated by Service System's service; a "Service Schedule," which lists the customers who were sent reminder letters and what services those customers are due; and a "Repair Order Analysis," which shows the services that were done during the previous month and how many times each was performed.

In October of 1990, Computer Care filed this lawsuit against Service Systems. Computer Care alleges that Service Systems has violated section 43(a) of the Lanham Act by (1) infringing Computer Care's

trade dress in its sales brochure, reminder letters and monthly reports; and (2) making advertising claims that are false as to Service Systems but true as to Computer Care, thereby "deceiv[ing] customers into believing that their service is Computer Care and not Service Systems." Plaintiff's Post-trial Brief at 8 (Dec. 24, 1990). Computer Care also claims that Service Systems misappropriated certain trade secrets belonging to Computer Care. Computer Care sought broad injunctive relief against Service Systems and the other defendants.

After an evidentiary hearing at which Service Systems presented no live testimony, the district court found that Computer Care had demonstrated a "substantial probability" of prevailing on the merits of its trade dress infringement and trade secret misappropriation claims. *Computer Care v. Service Sys. Enter., Inc.*, 761 F.Supp. 1333, 1336 (N.D.Ill.1991). The court also found that Computer Care had established the other criteria necessary for issuance of a preliminary injunction.[2] The court therefore enjoined Service Systems, Aronson and their agents and employees from (1) "continuing to operate Service Systems' business by utilizing" five elements[3] of Computer Care's system that the court found to be Computer Care trade secrets; and (2) "using, in any manner whatsoever," the "Maintain or Fail" brochure, any reminder letter with certain features found in Computer Care's reminder letters and its three monthly reports. *Id.* at 1338.

With respect to the false advertising claim, the court rejected Computer Care's contention that Service Systems' false statements "deceive customers" in the manner alleged by Computer Care. The court concluded, however, that "whether or not" such activity is actionable under the Lanham Act, it is "unfair competition that ... violates Illinois law." *Id.* at 1334. Nevertheless, the court failed to grant an injunction prohibiting Service Systems from continuing to make false advertising claims.

We review a district court's decision granting or denying a preliminary injunction under the deferential "abuse of discretion" standard. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir.1992); *see also Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir.1986). A district court "abuses its discretion when it commits a clear error of fact or an error of law." *Abbott Labs.*, 971 F.2d at 13. Thus, factual findings are reviewed under the clearly erroneous standard and conclusions of law are reviewed de novo. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1181 (7th Cir.1989); *Lawson Products*, 782 F.2d at 1437.

## II.

" 'Trade dress' refers to the total image of a product, including features such as 'size, shape, color or color combinations, texture, graphics, or even particular sales techniques.' " *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir.1989) (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)); *see also Abbott Labs.*, 971 F.2d at 20; *Vaughan Mfg. Co. v. Brikam Int'l, Inc.*, 814 F.2d 346, 348 n. 2 (7th Cir.1987). In order to prove trade dress infringement, the plaintiff must establish that: (1) its trade dress is "inherently distinctive" or has acquired "secondary meaning"; (2) the

---

**2.** In addition to demonstrating a likelihood of success on the merits, a party seeking a preliminary injunction must also show that "it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386–87 (7th Cir.1984). If the moving party establishes both prerequisites, "the court must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the

moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Abbott Labs.*, 971 F.2d at 11–12; *Roland Mach.*, 749 F.2d at 387–88.

**3.** Although the district court originally found that six of the features of Computer Care's system were protectable trade secrets, on reconsideration the court changed its ruling as to one of these elements.

similarity of the defendant's trade dress to that of the plaintiff creates a "likelihood of confusion" on the part of consumers; and (3) the plaintiff's trade dress is "non-functional"; *Roulo*, 886 F.2d at 935; *see also Abbott Labs.*, 971 F.2d at 20; *Schwinn Bicycle*, 870 F.2d at 1182–83. The third element, that of "functionality," is actually an affirmative defense on which the defendant bears the burden of proof. *Abbott Labs.*, 971 F.2d at 20; *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 338 (7th Cir.1985).

Service Systems argues that Computer Care failed to establish a likelihood of success on the merits of its trade dress claim because (1) Computer Care's reminder letter, brochure and monthly reports are not inherently distinctive and (2) Service Systems' versions of those documents do not pose a likelihood of confusion on the part of consumers. Service Systems also contends that Computer Care's monthly reports are not entitled to trade dress protection because they are functional.

### A. *Distinctiveness*

■ Computer Care's "Win or Lose!" sales brochure (reproduced in an appendix to this opinion) uses a four-page layout. The first page of the brochure consists of the words "Win or Lose" occupying the upper left quadrant, a drawing of a boxer in the upper right, and two columns of information on the bottom half. The column on the left lists three examples of how a dealer or repair shop will "lose" by not having Computer Care's service. Each of these examples is listed separately under the words "You Lose." The right-hand column contains three corresponding "You Win" entries, which inform the dealer of the benefits of having Computer Care's service. On the second page, under the heading "Round 1," the brochure describes the customer database that is created for each Computer Care customer. Under the heading "Round 2," the brochure describes Computer Care's reminder letters. This description is accompanied by an illustra-

tion of a reminder letter and envelope. On the third page, under the heading "Round 3," the brochure describes the three monthly reports, each of which is pictured. Finally, the back page of the brochure quotes various testimonials by Computer Care customers, along with Computer Care's address and phone number and space for salesmen to enter estimates of the cost of Computer Care's service.

Computer Care's reminder letters (reproduced in appendix) are printed on white paper with a blue right-angled design. Any "specials" the dealer may be offering that month are printed in the horizontal portion of the blue design. In the upper right corner Computer Care prints the manufacturer's logo, in the same blue as the right-angled design. The name and address of the dealer appear in the upper left corner. The dealer's telephone number appears twice in the letter—once in the body of the text and once at the end. The letters are addressed to "Mr." or "Ms." plus the car owner's last name. The letters are signed with the first names of dealer employees. The letters are mailed in a "window" envelope that features a slightly modified version of the blue right-angled design on the letters.

Computer Care's monthly reports (reproduced at appendix) each consists of columns of information accompanied by a summary description of the report at the top of the page. The "Profit Builder Response Analysis" consists of six vertical columns, headed as follows: (1) customers [sic] name; (2) model car; (3) letter mailed;[4] (4) services listed on letter as due; (5) services completed by the dealer; and (6) amount billed. The report also gives the total amount of money spent by customers responding to the service letters the previous month, the average repair order amount for customers responding, and the average repair order amount for other customers. The "Work Due Schedule" also contains six columns of information. These columns are headed: (1) customer, (2) phone, (3) car, (4) year, (5) service now

---

**4.** This column simply lists the date each reminder letter was mailed. Although it appears in the illustration of this report in the "Win or Lose!" brochure, it is not actually included in the current version of the report itself.

due, and (6) mileage of last service. Finally, the "Transaction Analysis" lists various types of car service on the left side and on the right the number of times each service was rendered during the previous month.

■ A plaintiff's trade dress is inherently distinctive, and therefore protectable without proof of secondary meaning, *Two Pesos, Inc. v. Taco Cabana, Inc.,* — U.S. —, —, 112 S.Ct. 2753, 2761, 120 L.Ed.2d 615 (1992), if it is "sufficiently distinctive to allow consumers to identify the product from the trade dress." *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1536 (11th Cir.1986). In order to be inherently distinctive, the trade dress must be either arbitrary or suggestive, rather than generic or descriptive. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1120 & n. 8 (5th Cir.1991), *aff'd,* — U.S. —, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *AmBrit,* 812 F.2d at 1537; *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,* 781 F.2d 604, 609 (7th Cir.1986). A district court's determination that a plaintiff's trade dress is inherently descriptive is a finding of fact, which we will reject only if clearly erroneous. *AmBrit,* 812 F.2d at 1535.

Computer Care's trade dress, as embodied in its sales brochure, reminder letters and monthly reports, is neither generic nor descriptive. Of course, some of its elements, such as the use of a window envelope to send out reminder letters, are arguably generic, *see Roulo,* 886 F.2d at 936; others, for example the illustrations in its sales brochure and the titles of its monthly reports, are arguably descriptive. But Computer Care's trade dress also contains elements that are at least suggestive, such as the blue right-angled design on the reminder letters and envelopes, which Service Systems argues is reminiscent of the logo on a Western Union telegram. And it has many features that appear to be arbitrary, including the three "Win or Lose" pairs on the first page of the brochure; the layout of the brochure; the division of the monthly dealer information into three reports,

with particular columns of information in a particular order; and the use of a certain shade of blue for the right-angled design and the manufacturer's logo on the reminder letters.

■ More important, the overall combination of these elements, which Service Systems copied wholesale, is largely arbitrary, and therefore inherently distinctive.[5] Where the plaintiff's overall trade dress is distinctive, the fact that it uses descriptive (or generic) elements does not render it nonprotectable. *Taco Cabana,* 932 F.2d at 1120; *Roulo,* 886 F.2d at 936. Thus, in *Roulo,* this court held that although the plaintiff's trade dress "incorporated several common features such as stripes, dots, handwriting and other common design elements," the plaintiff's "combination of these elements was sufficiently unique to warrant trade-dress protection." 886 F.2d at 936. Finally, there was evidence that, except for Service Systems' documents, Computer Care's trade dress is unique in the car services industry. We have held that evidence of uniqueness supports a finding that a trade dress is inherently distinctive. *Id.* The district court's conclusion that "there is a high likelihood that Computer Care's trade dress is inherently distinctive" is not clearly erroneous.

## B. *Likelihood of Confusion*

Service Systems' sales brochure, reminder letters and monthly reports are slavish imitations of Computer Care's documents. Indeed, the district court stated that "any suggestion ... that Service Systems had developed its materials independently, rather than by copying them from Computer Care virtually lock, stock and barrel, is rejected as incredible." *Computer Care,* 761 F.Supp. at 1335. Nevertheless, Service Systems argues that the district court erred in finding that its documents were *confusingly* similar to those of Computer Care—that is, likely to cause confusion

---

**5.** We also note that, even if the trade dress were merely suggestive, Computer Care would be entitled to protection from wholesale copying of that trade dress by a direct competitor. *Taco Cabana,* 932 F.2d at 1120 n. 8.

among consumers—because Computer Care offered no evidence of confusion other than the documents themselves. In addition, Service Systems argues that its documents pose no likelihood of confusion because (1) potential customers encounter those documents (or Computer Care's) for the first time during a sales presentation in which the identity of the vendor is clearly and repeatedly disclosed, and (2) the customers in question are car dealers, not unsophisticated consumers shopping in a supermarket.

■■■ The district court's conclusion that Service Systems' sales brochure, reminder letters and monthly reports are likely to confuse consumers is a finding of fact that we will affirm unless clearly erroneous. *Forum Corp. v. Forum, Ltd.*, 903 F.2d 434, 438 (7th Cir.1990). Service Systems' arguments do not persuade us that the district court committed clear error. The district court determined that Service Systems had intentionally copied Computer Care's documents. Although deliberate copying does not create a *presumption* of consumer confusion, it is an "important *factor bearing on the likelihood of confusion.*" *Schwinn Bicycle*, 870 F.2d at 1183 (quoting *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 857 (7th Cir.1982) (emphasis added in *Schwinn Bicycle*)). Further, the close similarity between the parties' trade dresses in side-by-side comparison is also a "factor to be considered in evaluating the likelihood of confusion." *Roulo*, 886 F.2d at 937. Thus, it cannot be said that Computer Care presented "no evidence" of likelihood of confusion. Computer Care is not required to show *actual* consumer confusion, particularly at the preliminary injunction stage. *Abbott Labs.*, 971 F.2d at 22 n. 7; *see also Roulo*, 886 F.2d at 938 (upholding jury verdict for plaintiff "even absent the difficult-to-acquire evidence of actual confusion").

■■ Nor does the fact that Computer Care's customers are "sophisticated" car dealers mean that, as a matter of law, there is no likelihood of confusion. "Human memories, even of discriminating purchasers, ... are not infallible." 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 23:29, at 136 (2d ed.1984). Indeed, we can readily imagine a scenario in which confusion is quite likely. Suppose that a New York car dealer who subscribes to Computer Care's service tells a Chicago car dealer about it.[6] The New York dealer shows him the brochure, the monthly reports and perhaps a copy of a reminder letter, and tells the Chicago dealer what a great service this is. Some weeks later, a Service Systems salesperson shows up at the Chicago dealership and gives the dealer a sales presentation, showing him the brochure, the monthly reports and the reminder letters. The Chicago dealer doesn't remember the name of the service recommended by the New York dealer, but the documents look very familiar, so he thinks this is the one and he subscribes.

Finally, as the above hypothetical suggests, it is not necessarily true that consumers first encounter Computer Care's and Service Systems' documents during a sales pitch in which the name of the vendor is repeatedly disclosed. Despite Service Systems' representations to the contrary, the district court did not make such a finding. Further, even if this assertion were accurate, it would not necessarily eliminate the likelihood of confusion. For example, a dealer might be given a sales pitch by Computer Care, and be impressed by Computer Care's record of service, but not certain at that point that he needs such a program. Several weeks or even months later, he might get a call from a Service Systems salesperson, who shows him brochures and other documents that look very similar to those he was shown by the Com-

6. We will assume, for purposes of this inquiry, that car dealers who compete in the same area would not share information about a service designed to increase their own competitive advantage, although we suspect that there are other ways in which a dealer might hear about Computer Care outside a Computer Care sales presentation.

puter Care representative. Particularly if the sales pitch includes the misrepresentations alleged by Computer Care and found by the district court (see *infra*), the dealer might now subscribe to the service thinking that it is the same one he had heard about before.

Finally, it seems quite likely that the similarity of the parties' trade dress could lead dealers to believe that the two companies are associated in some way. That kind of confusion could damage Computer Care if dealers are dissatisfied with Service Systems' product, as Computer Care alleges that some are. We do not find the district court's conclusion that Service Systems' documents are "confusingly similar" to Computer Care's to be clearly erroneous.

### C. *"Functionality" of Monthly Reports*

■ A trade dress feature is "functional," and therefore not protectable, if it is "one which competitors would have to spend money not to copy but to design around.... It is something costly to do without (like the hood [of a car]), rather than costly to have (like the statue of Mercury [on the hood of a Rolls Royce])." *Schwinn Bicycle*, 870 F.2d at 1188 (quoting *W.T. Rogers Co.*, 778 F.2d at 339). Put another way, a functional feature is one that "would be found in most or all brands of the product even if no producer had any desire to have his brand mistaken for that of another producer." *Id.* (internal quotations omitted). It is a feature, such as the oval shape of a football, "that competitors would find necessary to incorporate into their product in order to be able to compete effectively." *Vaughan Mfg.*, 814 F.2d at 349.

It is clear that certain elements of Computer Care's computer-generated monthly reports are "functional" under these definitions. For example, Computer Care cannot claim an exclusive right to display information in columns or to include the make and year of a car in its reports. But Computer

Care makes no such claim. Rather, Computer Care seeks to protect the overall format of each of its monthly reports, which Service Systems copied in their entirety. In such a case, it is error to "focus[ ] on the individual elements rather than the overall trade dress." *Vaughan Mfg.*, 814 F.2d at 350. For example, in *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71 (2d Cir.1985), which the *Vaughan Mfg.* court cited with approval, K Mart argued that certain design features of LeSportsac's line of lightweight nylon luggage and bags were functional and thus not protectable. The Second Circuit rejected such an atomized approach:

> [B]y breaking LeSportsac's trade dress into its individual elements and then attacking certain of those elements as functional, K Mart misconceives the scope of the appropriate inquiry. LeSportsac does not claim a trademark in all lightweight nylon bags using hollow zipper pulls or carpet tape trim. It claims as its mark the particular combination and arrangement of design elements that identify its bags and distinguish them from other bags.

814 F.2d at 350 (quoting *LeSportsac*, 754 F.2d at 76). Similarly here, Computer Care claims as its protectable trade dress only the "particular combination and arrangement" of information in each of its three monthly reports. Computer Care presented evidence of "service reports" used by other car service companies that bear little or no resemblance to Computer Care's reports. In addition, Kaufman testified that until 1980 Computer Care itself used only two of its current three reports. The district court did not err in concluding that the "combination and arrangement" of features in Computer Care's reports is not functional.

### III.

The district court found "a high likelihood that the methodology employed by Computer Care in its service program ... involves trade secrets that are unique to Computer Care." 761 F.Supp. at 1338.

Specifically, the court found that the following five elements of Computer Care's system qualified as trade secrets:

1. the use of twelve different car repair services to "trigger" reminder letters, rather than the one or two basic services used by the competition;

2. offering dealers the option of "adjustable service cycles" rather than the manufacturer's recommended service cycle;

3. tracking car owners by a method other than license plate number or Vehicle Identification Number (VIN); [7]

4. sending car owners a second reminder letter if they do not respond to the first one; and

5. automatically putting the names of car owners who do not respond after two reminder letters in "inactive status."

Mem. Op. and Order at 3 (Apr. 23, 1991) (modifying decretal provisions of order published at 761 F.Supp. 1333) and 761 F.Supp. at 1343–45, incorporated by reference. Accordingly, the district court enjoined Service Systems from utilizing any of these items in its reminder letter business. Service Systems argues that the court's decision should be reversed because none of these five elements of Computer Care's system is a protectable trade secret. We agree.

The Illinois Trade Secrets Act defines a trade secret as follows:

"Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

Ill.Rev.Stat. ch. 140, ¶ 352(d)(1). As the Illinois courts have noted, "the focus of ... the Act is on the secrecy of the information sought to be protected." *Service Centers of Chicago, Inc. v. Minogue,* 180 Ill.App.3d 447, 129 Ill.Dec. 367, 371, 535 N.E.2d 1132, 1136 (1989). The "trade secrets" claimed by Computer Care, however, are not "secret" in the sense required by the Act. In *Service Centers,* the Illinois appellate court found that a pricing formula for the storage of medical records did not meet the statutory criteria for secrecy because it was "within the realm of general skills and knowledge" in the relevant industry. *Id.,* 129 Ill.Dec. at 372, 535 N.E.2d at 1137. More generally, the first district appellate court has stated that "the key to 'secrecy' is the ease with which information can be developed through other proper means: if the information can be readily duplicated without involving considerable time, effort or expense, then it is not secret." *Hamer Holding Group, Inc. v. Elmore,* 202 Ill. App.3d 994, 148 Ill.Dec. 310, 321, 560 N.E.2d 907, 918 (1990). Computer Care failed to demonstrate that any of its alleged trade secrets are not either "within the realm of general skills and knowledge" in the car service industry or "readily duplicated without involving considerable time, effort or expense."

**A. Multiple Triggers**

■■■ The district court found that Computer Care's use of twelve different car repair services to trigger its system was a protectable trade secret, and therefore enjoined Service Systems "from triggering a system off any repair service except oil change." Mem. Op. at 4. This ruling constituted an abuse of the court's discretion. Even if Computer Care could have a trade secret in its particular twelve triggers, the only evidence that Service Systems in fact uses those precise triggers was Kaufman's statement that the trade secrets to which he testified were items "that have been incorporated to my knowledge in Service

---

**7.** The record does not show what method Computer Care actually uses to track car owners.

Systems' system." Tr. at 350–51 (Dec. 17, 1990). We doubt that such general and unsupported testimony is sufficient to justify the district court's exercise of the "far-reaching power" to grant a preliminary injunction. *Schwinn Bicycle*, 870 F.2d at 1181.

Moreover, the district court's injunction does not merely protect Computer Care's twelve triggers, but grants Computer Care a trade secret in the mere *idea* of using more than one trigger. We do not think that the use of multiple triggers is sufficiently "secret" to be protected. Kaufman testified that he had decided to use multiple triggers because "[w]hen I did analysis of different service systems that were available I found" that most of them used just one or two triggers. Tr. at 351–52. But Computer Care failed to present any evidence that information about these different systems was not generally available in the industry. *See Service Centers*, 129 Ill.Dec. at 371, 535 N.E.2d at 1136 (plaintiff failed to show that the information underlying its pricing "rules of thumb" was not generally known in the industry). Nothing in the record suggests that the possibility of using more than one trigger would not be obvious to someone entering the reminder letter business. There was no evidence that Computer Care had expended substantial time or money in reaching the conclusion that using more than one trigger would be a good idea. *See id.* (plaintiff failed to direct the court to any evidence concerning the amount of "time, money or effort involved" in compiling customer survey questions for which it sought protection). Further, the fact that Computer Care is the only company in the industry, other than Service Systems, that uses multiple triggers does not show that the use of multiple triggers is a trade secret. "Simply being the first or only one to use certain information does not in and of itself transform otherwise general knowledge

into a trade secret." *Id.* 129 Ill.Dec. at 372, 535 N.E.2d at 1137. Computer Care's use of multiple triggers is not a protectable trade secret.

### B. *Adjustable Service Cycles*

 The term "adjustable service cycles" refers to the fact that Computer Care will adjust its reminder letter program to send out letters at the intervals requested by a particular dealer, rather than those recommended by the car manufacturer. The district court found that this feature "is available to dealers who specifically ask for it but is not offered generally; it is therefore secret." *Computer Care*, 761 F.Supp. at 1344. We disagree. Computer Care's use of adjustable service cycles is not a novel idea developed by Computer Care, but simply a response to its customers' requests.[8] As Service Systems points out, "[e]ven if the notion of adjusting a service cycle is novel and not generally known within the reminder letter business ... that novelty disappears as soon as the first customer requests adjustment to the service cycle." Br. at 14. There is nothing secret about the idea of listening to a customer and accommodating his wishes. *Cf. Carbonic Fire Extinguishers, Inc. v. Heath*, 190 Ill.App.3d 948, 138 Ill.Dec. 508, 511, 547 N.E.2d 675, 678 (1989) (pricing information that may be obtained from plaintiff's customers is not secret); *Service Centers*, 129 Ill.Dec. at 371, 535 N.E.2d at 1136 (customer survey which "embodied nothing more than the standard questions any salesman in the industry would need to ask in determining a customer's needs" is not protectable trade secret).

### C. *Tracking Customers by Method Other Than VIN or License Plate*

 The district court found Computer Care's use of a method other than VIN or license plate number to track car owners in its database is a trade secret, and therefore enjoined Service Systems from using any

---

**8.** Of course, the *way* in which Computer Care adjusts its service cycles—that is, the software it uses to perform that task—is protectable, but

that is distinct from the mere idea of adjusting service cycles to customers' needs.

tracking method other than VIN or license plate number. Kaufman testified that although the automobile industry generally uses either VIN or license plate number to track customers, he decided on a system that was "not dependent upon license plates or VIN numbers" because he found that some repair shops did not record either the car's VIN or license plate number. Tr. at 353. Again, Computer Care offered no evidence that it is not generally known in the industry that some repair shops do not record VIN or license plate numbers, or that a different method of tracking would not be an obvious solution to that problem for anyone going into the reminder letter business. That Computer Care may have been the first in the car industry to adopt a different method of tracking does not establish that the practice is secret. *Service Centers*, 129 Ill.Dec. at 372, 535 N.E.2d at 1137. Indeed, it may well be that Computer Care has adopted a method of tracking that is quite common in the direct mail business generally. If that is so, Computer Care certainly should not be able to appropriate the application of that method to a particular industry for its own.

### D. *Second Reminder Letter*

 Computer Care failed to establish that the idea of sending a second reminder letter to a customer who does not respond the first time is a trade secret, rather than simple common sense. Other than Kaufman's general statement that all of Computer Care's alleged trade secrets were items that were unique to that system, Computer Care presented no evidence that the use of follow-up letters is not common in either direct mail generally or the reminder letter business specifically. This is not really surprising, given that the use of follow-up letters is an obvious sales method, as anyone who has ever allowed a magazine subscription to run out can attest. The district court erred in affording Computer Care trade secret protection for this feature of its system.

### E. *Automatically Removing Nonresponding Individuals from Database*

 Computer Care failed to show that deleting nonresponding individuals from a database is not an obvious feature of a direct mailing system. The idea of saving money by not continuing to send letters to customers who have failed to respond in the past is hardly novel. There is no evidence that Computer Care's use of such a feature is unique either in the direct mail business or in the car service industry. Nor is there any evidence in the record concerning "the amount of time, money or effort involved" in developing this idea. *Service Centers*, 129 Ill.Dec. at 371, 535 N.E.2d at 1136. Computer Care does not have a protectable trade secret in this feature.

### F. *The "Profit Builder System"*

 Computer Care argues that, whether or not the individual features of its system are protectable trade secrets, the Profit Builder System comprised of these components is a protected trade secret that Service Systems misappropriated in its entirety. Computer Care relies on *SmokEnders, Inc. v. Smoke No More, Inc.*, 184 U.S.P.Q. 309, 1974 WL 20234 (S.D.Fla. 1974), in which the court held that the plaintiff's commercial program for teaching enrollees to stop smoking was a protectable trade secret. In so holding the court stated: "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process design and operation of which in unique combination affords a competitive advantage and is a protectable trade secret." *Id.* at 317.

The *SmokEnders* principle is sound, but we do not believe it applies here. The program at issue in *SmokEnders* is a highly structured regimen "comprised of specific assignments and detail concepts" that "requires that each person attending the program perform each act at a particular time." *Id.* at 312. Further, the court found that "the length and complexity of

the program make it too much for an attendee to remember or to memorize enough of the program to appropriate it." *Id.* By contrast, Computer Care's system does not take its individual features and transform them into something that is itself secret—that is, not generally known or easily duplicated by the industry. All of the individual features discussed above are either sufficiently obvious that anyone entering the reminder letter business would be likely to incorporate them into his system, or easily duplicated by anyone with legitimate, publicly available knowledge of Computer Care's business. Moreover, unlike the *SmokEnders* system, Computer Care's system is readily replicable by anyone who has been exposed to its various components; one need not also have knowledge of a special formula or technique for combining those components. Computer Care has therefore failed to establish that it has a protectable trade secret in its Profit Builder System as a whole.

## IV.

Computer Care alleged, and the district court found, that Service Systems had promoted its business by making representations that are false as to Service Systems, though true as to Computer Care, in order to "deceive potential customers into believing that Service Systems has a record of experience, customer satisfaction, and successful performance substantiated by objective evidence." 761 F.Supp. at 1342. Specifically, the district court found that Service Systems has made the following misrepresentations:

1. Service Systems has "hundreds of auto dealers" and "dealers all over the country" using its services. Service Systems had been making this false statement since July or August of 1990. In actuality, of course, Service Systems is a start-up company operating only in the Chicago area that had only one hundred customers as of December 1990;

2. Service Systems has been in business "more than a dozen years."

3. Service Systems has "done work for Chrysler." Service Systems has never had any relationship with Chrysler Corporation, although Computer Care has.

4. Chrysler Corporation did a test using Service Systems' program that substantiated the effectiveness of that program. In fact, Chrysler did such a test with Computer Care, not Service Systems.

*Id.*

■ The district court rejected Computer Care's claim that Service Systems' false advertising "deceive[s] customers into believing that their service is Computer Care and not Service Systems," stating that "this action is not a 'palming off' case in that sense." *Id.* at 1334. The court concluded, however, that "whether or not" Service Systems' activities were actionable under the Lanham Act, they constituted "unfair competition that ... violates Illinois law." *Id.* Nevertheless, the district court did not grant Computer Care injunctive relief on this claim. Computer Care cross-appeals from this decision. Although the district court did not explicitly deny Computer Care's request that it enjoin the false advertising, the court's failure to grant such relief when it was sought by Computer Care has the substantive effect of a denial, and therefore is reviewable by this court. *Carson v. American Brands, Inc.,* 450 U.S. 79, 83–84, 101 S.Ct. 993, 996–997, 67 L.Ed.2d 59 (1981).

■ The court's discussion of Computer Care's false advertising claim presents two possibly significant problems. First, the court seems to suggest that "palming off" is necessary to state a false advertising claim under section 43(a) of the Lanham Act. That is clearly not the law in this circuit. *See Abbott Labs.,* 971 F.2d at 11 (finding that plaintiff is likely to prevail on merits of false advertising claim under section 43(a) even though there was no allegation of palming off). But that cannot explain the failure to grant preliminary relief, since the court explicitly held that Service

Systems' false advertising *was* actionable under state law. This brings us to the second problem with the court's decision. In its discussion of this issue, the court seems to conclude that an injunction against Service Systems' false advertising *is* warranted: "the combination of defendants' past culpable activity and the nature of their response to this litigation calls for a total lack of confidence in the noninfringing nature of their future conduct unless Computer Care is given the assurance that can be provided only by an injunction order." 761 F.Supp. at 1335. Thus, the court's failure to grant such an injunction may simply have been oversight on its part. Because we are unable to discern the district court's reasons for its decision not to enjoin Service Systems' false advertising, we cannot properly review that decision. Therefore, we remand this issue for further consideration by the district court.

## V.

For the foregoing reasons, the decision of the district court is AFFIRMED in part, REVERSED in part and REMANDED for further proceedings consistent with this opinion.

# APPENDIX

## Computer Care's Reminder Letter

## Service Systems' Reminder Letter

## ROUND 1

We build a customer base for you from your 'repair orders and calculate when repeat service is due. Each month we update your customer base with the latest information from your current repair orders.

## ROUND 2

Each month we search your customers records for services that are due due immediately. You will be excited by our ability to follow up recommendations made on your repair orders.

What happens now when you note on the repair order that brakes will soon be needed? Often nothing. The customer leaves and may forget or go elsewhere. With this system, that customer will receive a personal letter from you reminding him to return.

We mail personalized letters - not throw away post cards - in our exclusive Mem-O-Gram envelope.

Bonus-free Ad Lines - we will program monthly whatever message or special you would like to appear with our normal letter. Promote shocks, engine analysis, wheel alignments, etc.

Your customers will see your name, phone number and address at the same time they see what services they need done. How will they respond? Where will they go for service? How will they feel about this extra attention and professional service you are giving them?

# WIN OR LOSE!

**YOU LOSE**
When customers put off, skip or forget to bring their cars in for service.

**YOU WIN**
When you remind customers precisely when service is needed and schedule their work before they even think about going anyplace else!

**YOU LOSE**
When franchise chains siphon off profitable services like brakes, mufflers, tune ups and now even oil changes.

**YOU WIN**
When you promote the high profit services you want!

**YOU LOSE**
When your customers become someone else's!

**YOU WIN**
When you retain customers! When you make them feel you care about them and their cars!

Make the WINNER'S CHOICE with the "Profit Builder System". service follow up and customer retention made easy!

Computer Care's Sales Brochure

Service Systems' Current Sales Brochure

Service Systems' Current Sales Brochure

# MAINTAIN OR FAIL!

## MAINTAIN OR FAIL
By reminding your customers when service is needed or due in order to help assure trouble-free automobile transportation.

When customers delay or forget to bring their cars in for service.

## MAINTAIN OR FAIL
By promoting the high quality services you provide!

By allowing franchise chains to provide your customers with their services rather than yours, such as oil, brake jobs, mufflers, tune-ups, etc.

## MAINTAIN OR FAIL
By retaining your customers! When you provide them with genuine promises and assistance.

When your customers become someone else's!

## Maintain or Fail!

We begin your base of customers by reviewing repair orders and calculating when repair services are due. Each month we will update your customer base with the latest information from your current repair orders.

You will also be happy to know that each month we search our records for customers that are due for immediate services.

We inform the customers with a personalized letter that includes Bonus-Line Ad Lines in which we will program monthly whatever message or special you would like to appear with our letter.

Your customers will see your name, phone number and address at the same time they see what services they need done. How will they respond after seeing the professional attention they were given?

Service Systems' Earlier Sales Brochure

Maintain . . .

### SERVICE SYSTEMS MONTHLY REPORT

This report will give the names of the customers who responded to the letter. Along with their name we list their vehicle, when the letter was sent, the work that was suggested, the work that was actually done, and the total dollars spent. We also total the dollars that were generated as a result of the letters, and then we total the dollars that were generated on an average R.O. as a result of the letter, and the people who didn't receive a letter.

Or Fail!

**Service
Systems**

5521 N. Cumberland, Suite 1103
P.O. Box 56653 • Chicago, IL 60656
Phone: 312-775-0721
Fax: 312-775-0723

*Eligible For Many Co-op Programs*

---

## • MANAGEMENT REPORTS •

Maintain . . .

### SERVICE SCHEDULE

This report lists the services that are due on the vehicle. We list the person's name, their phone number, their vehicle, the work that's scheduled to be done and the miles at the last visit.

### REPAIR ORDER ANALYSIS

This report gives the total number of jobs that have been done for the month. This is used as a management and marketing tool that can help generate additional services.

1084

## Computer Care's Monthly Reports
## (as Reproduced in "Win or Lose!" Brochure)

---

### THE PROFIT BUILDER RESPONSE ANALYSIS

PAGE 10

Hempstead Motors
181 Nassau Blvd.
Garden City, N.Y 11530

THIS REPORT IS BASED ON THE REPAIR ORDERS PRIMARILY FROM JULY THOUGH IT MAY INCLUDE SOME EARLY AUGUST WORK. GENERALLY, THIS REPORT ANALYZES A 30 DAY BUSINESS PERIOD. ONLY LEGIBLE REPAIR ORDERS WITH NAME AND ADDRESS, CAR MODEL AND CAR YEAR WERE INCLUDED IN THIS REPORT.

| CUSTOMERS NAME | MODEL CAR | LETTER MAILED | SERVICES LISTED ON LETTER AS DUE | SERVICES COMPLETED BY THE DEALER | AMOUNT BILLED |
|---|---|---|---|---|---|
| PURSER | 79 CHEVROLET | 9/1 | OIL · LUBE · FILTER | TRANSMISSION TUNEUP OIL · LUBE · FILTER | $40.88 |
| RAGLAND | 86 CHEVROLET | 9/1 | OIL · LUBE · FILTER | WHEEL ALIGNMENT | $24 00 |
| RIDLEY | 84 CADILLAC | 9/1 | OIL · LUBE · FILTER | OIL · LUBE · FILTER | $19 60 |
| ROBERTS | 83 CHEVROLET | 9/1 | OIL · LUBE · FILTER | OIL LUBE · FILTER WHEEL ALIGNMENT | $37 18 |
| ROBINSON | 64 CADILLAC | 9/1 | ENGINE TUNEUP | MISCELLANEOUS WORK | $25 00 |
| ROBINSON JR | 83 CHEVROLET | 9/1 | OIL · LUBE · FILTER WHEEL ALIGNMENT | WHEEL ALIGNMENT | $24 50 |
| RODGERS | 87 CHEVROLET | 9/1 | OIL · LUBE · FILTER TIRES ROTATED/CHECKED WHEEL ALIGNMENT | OIL · LUBE · FILTER TIRES ROTATED/CHECKED | $35 00 |
| SCHEILE | 84 CADILLAC | 9/1 | OIL · LUBE · FILTER | ENGINE COOLANT CHECKUP OIL · LUBE · FILTER ADDITIONAL SVC OR PRODUCT | $35 00 |
| SHUNNARAH | 87 CHEVROLET | 9/1 | ENGINE TUNEUP OIL · LUBE · FILTER BRAKE SAFETY CHECK TIRES ROTATED/CHECKED | TRANSMISSION TUNEUP ENGINE TUNEUP OIL · LUBE · FILTER | $177 80 |
| SMITH | 83 CHEVROLET | 9/1 | OIL · LUBE · FILTER | OIL · LUBE · FILTER | $19.60 |

MONEY SPENT BY CUSTOMERS RESPONDING TO THE SERVICE LETTER 13963 13
AVERAGE REPAIR ORDER AMOUNT FOR CUSTOMERS RESPONDING 583 78
AVERAGE REPAIR ORDER AMOUNT FOR OTHER CUSTOMERS 551.63
THIS REPORT IS BASED ON ONLY 95 PERCENT OF RO-S PROBLEM — INPUT PROCESSED FROM 7/1/88 to 8/5/88
GROSS SALES $14,687 BT COST OF LAST MAILING $296 48

---

Hempstead Motors
181 Nassau Blvd.
Garden City, N.Y. 11530

### WORKDUE SCHEDULE

Page 1

THIS REPORT IS PROVIDED TO SHOW WHICH CUSTOMERS HAVE BEEN MAILED LETTERS AND WHAT THEY NEED DONE. WHEN THE CUSTOMER BRINGS HIS CAR IN FOR SERVICE, CHECK THAT ALL ITEMS NEEDED ARE DONE.

AFTER A COUPLE OF WEEKS, HAVE MECHANICS CHECK OFF CUSTOMERS THEY HAVE SERVICED RECENTLY. THEN HAVE SOMEONE WITH A PLEASANT PHONE VOICE CALL THE REST OF THE CUSTOMERS TO SCHEDULE AN APPOINTMENT.

SIMPLY SAY — TO AVOID ANY INCONVENIENCE FOR OUR CUSTOMERS WE ARE SETTING UP A SERVICE SCHEDULE. I NOTICE YOUR CAR IS DUE FOR. ... MAY I MAKE AN APPOINTMENT FOR YOU THIS WEEK OR WOULD ONE DAY NEXT WEEK BE BETTER — (PAUSE) WHICH DAY IS BEST FOR YOU... .

DEALERS WHO FOLLOW THE ABOVE THREE STEPS KNOW WHY OUR PROGRAM IS CALLED THE · PROFIT BUILDER.'

| CUSTOMER | PHONE | CAR | YEAR | SERVICE NOW DUE | MILEAGE OF LAST SVC. |
|---|---|---|---|---|---|
| MR ALI | 381-7081 | CHEV | 1986 | ENGINE MAINTENANCE & TUNEUP | 11,140 |
| MR ALLEN | 590-1305 | CHEV | 1986 | NEXT NORMAL SERVICE | 13,312 |
| MR ALLEN | 388-6945 | CADILLAC | 1984 | ENGINE MAINTENANCE & TUNEUP | 35,603 |
| MR ANDREWS | 367-4291 | CHEV | 1980 | ENGINE MAINTENANCE & TUNEUP | 94,145 |
| MR ANDREWS | 250-7692 | CADILLAC | 1987 | NEXT NORMAL SERVICE | 124,905 |
| MR ASKEW | 293-2310 | CHEV | 1985 | NEXT NORMAL SERVICE | 42,270 |
| MS AYBLE | 422-1811 | CHEV | 1986 | NEXT NORMAL SERVICE | 19,041 |
| MR AYERS | 670-3957 | CHEV | 1986 | NEXT NORMAL SERVICE | 18,033 |
| MR AYLOR | 388-2121 | CADILLAC | 1985 | ENGINE MAINTENANCE & TUNEUP | 11,198 |
| MR BARKER | 309-2994 | CADILLAC | 1983 | INSPECTION | 75,280 |
| MR BARR | 388-1337 | CADILLAC | 1988 | NEXT NORMAL SERVICE | 25,280 |
| MR BARTOS | 367-2014 | CHEV | 1980 | ENGINE MAINTENANCE & TUNEUP TIRES ROTATED & CHECKED FRONT END ALIGNMENT & CHECKUP | 90,029 90,029 90,029 |

---

### TRANSACTION ANALYSIS

Page 1

Hempstead Motors COMPANY CODE GB
181 Nassau Blvd. GB
Garden City, N.Y. 11530 GB

IN THE MOST RECENT BATCH OF REPAIR ORDERS WE PROCESSED THESE ARE THE TOTAL OF SERVICES WE WERE ABLE TO PICKUP.

ONLY REPAIR ORDERS CONTAINING THE CUSTOMERS NAME, ADDRESS INCLUDING TOWN, MAKE OF CAR AND YEAR OF CAR ARE PROCESSED EACH MONTH FOR YOU.

| | |
|---|---|
| ENGINE MAINTENANCE & TUNEUP | 73 |
| TRANSMISSION MAINTENANCE | 1 |
| BRAKE SYSTEM SERVICE | 40 |
| NEXT NORMAL SERVICE | 144 |
| NEW TIRES NEEDED | 5 |
| BRAKE SAFETY CHECKUP | 46 |
| NEW & USED ENROLLMENTS | 23 |
| SHOCKS TESTED AND/OR REPLACED | 3 |
| TIRES ROTATED & CHECKED | 10 |
| ENGINE COOLANT CHECKUP | 1 |
| AIR CONDITIONING MAINTENANCE | 2 |
| FRONT END ALIGNMENT & CHECKUP | 13 |
| MUFFLER & EXHAUST WORK | 17 |
| STATE INSPECTIONS | 50 |

## Service Systems' Monthly Reports
## (as Reproduced in "Maintain or Fail!" Brochure)

### SERVICE SYSTEM MONTHLY REPORT

CUSTOMER ACCOUNT NUMBER
CHICAGOLAND DEALER
1234 STATE STREET
CHICAGO, IL 60601

THIS REPORT IS COMPUTED BASED ON REPAIR ORDERS RECEIVED THE MONTH PRIOR TO THE LETTER DATE LISTED BELOW. THIS TYPE OF REPORTS PRINTED ONCE A MONTH ON EVERY 30 DAYS. ONLY REPAIR ORDERS THAT ARE LEGIBLE AND INCLUDE CUSTOMER NAME, ADDRESS, PHONE, CAR MODEL & YEAR ARE INCLUDED.

| CUSTOMER LASTNAME | CAR YEAR/MAKE | LETTER DATE | SERVICES LISTED TO BE DONE | SERVICES COMPLETED BY THE CLIENT | AMOUNT BILLED |
|---|---|---|---|---|---|
| STEVENS | 87 CHEVROLET | | LUBE, OIL & FILTER CHANGE | LUBE, OIL & FILTER CHANGE BRAKE SERVICE | $148.52 |
| THOMPSON | 89 FORD | | ENGINE COOLANT MAINT. | ENGINE COOLANT MAINT. LUBE, OIL & FILTER CHANGE | $33.30 |
| WICKENS | 88 CHRYSLER | | WHEEL ALIGNMENT | TIRE ROTATION & BALANCE OTHER SERVICES | $98.25 |
| WILLIAMS | 89 NISSAN | | LUBE, OIL & FILTER CHANGE | LUBE, OIL & FILTER CHANGE BRAKE CHECK | $185.55 |
| YOUNG | 87 TOYOTA | | ENGINE TUNE-UP TIRE ROTATION & BALANCE | ENGINE TUNE-UP WHEEL ALIGNMENT SHOCKS / STRUTS OTHER SERVICES | $379.55 |

TOTAL DOLLARS SPENT FROM CUSTOMERS RESPONDING TO THE LETTERS ...... $1804.38
AVERAGE DOLLARS SPENT FROM CUSTOMERS REPAIR ORDERS ...... $319.13
OTHER CUSTOMERS AVERAGE REPAIR ORDER AMOUNT ...... $148.23
MONTHLY COST OF SERVICE LETTERS MAILED ...... $228.44

### SERVICE SCHEDULE

11/30/99 - PAGE 1

CUSTOMER ACCOUNT NUMBER
CHICAGOLAND DEALER
1234 STATE STREET
CHICAGO, IL 60601

THIS REPORT SHOWS YOU ALL THE CUSTOMERS WE SENT LETTERS AND THE WORK THAT IS SCHEDULED TO BE COMPLETED. WHEN THE CUSTOMERS CAR ARRIVES MAKE SURE THAT ALL THE ITEMS ON THIS REPORT ARE CHECKED OFF.

AFTER A FEW WEEKS HAVE GONE BY, HAVE THE SERVICE MANAGER GO OVER THE LIST AND CHECK OFF ALL OF THE CUSTOMERS THAT BROUGHT THEIR CARS IN FOR SERVICE AND THE REST OF THE LIST NEEDS TO BE CALLED.

WHEN CALLING THIS LIST INTRODUCE YOURSELF AND TELL THEM WHERE YOU ARE CALLING FROM. HAVE SOMEONE FROM YOUR OFFICE WITH A PLEASANT VOICE MAKE THE CALLS AND SAY, HI MY NAME IS _____ AND I'M CALLING FROM _____ ACCORDING TO OUR RECORDS YOUR CAR IS DUE FOR _____ AND I WOULD LIKE TO SET UP AN APPOINTMENT FOR YOU TO BRING YOUR CAR IN AT YOUR CONVENIENCE. HOW DOES THIS WEEK LOOK ON YOUR SCHEDULE IF ANING ... OR WOULD ONE DAY NEXT WEEK BE BETTER FOR YOU.

BY FOLLOWING ALL THE STEPS EXPLAINED BY OUR SERVICE REP YOUR REPAIR CAR BE EVEN BETTER.

| CUSTOMER | PHONE | CAR | YEAR | SERVICE DUE | MILEAGE |
|---|---|---|---|---|---|
| MR. ANGELL | 312-555-9932 | CHEVROLET | 1988 | LUBE, OIL & FILTER CHANGE | 43,182 |
| MR. ARLINGTON | 708-555-4737 | FORD | 1988 | AIR CONDITION CHECK | 24,384 |
| MR. ALLEN | 708-555-4137 | CHRYSLER | 1987 | ENGINE TUNE-UP | 32,549 |
| MR. ANDERSON | 312-555-0985 | NISSAN | 1989 | LUBE, OIL & FILTER CHANGE | 10,545 |
| MS. ANDREWS | 708-555-3080 | TOYOTA | 1988 | SHOCKS/STRUTS CHECK | 22,753 |
| MR. ARCHE | 312-555-9173 | DODGE | 1987 | LUBE, OIL & FILTER CHANGE | 29,313 |
| MR. ARNOLD | 312-555-0190 | PONTIAC | 1988 | MUFFLER & EXHAUST CHECK | 44,234 |
| MR. ATHER | 312-555-9204 | CADILLAC | 1988 | WHEEL ALIGNMENT | 17,998 |
| MS. BAHR | 708-555-0921 | OLDSMOBILE | 1987 | ENGINE TUNE-UP | 50,559 |
| MS. BENNETT | 708-555-0945 | MERCURY | 1988 | LUBE, OIL & FILTER CHANGE | 15,578 |
| MR. BURNS | 312-555-0524 | PORSCHE | 1989 | LUBE, OIL & FILTER CHANGE | 4,940 |
| MR. BUFFLACK | 708-555-3412 | AUDI | 1989 | ENGINE COOLANT CHECK-UP | 1,540 |
| MR. BURNS | 708-755-0972 | BMW | 1989 | LUBE, OIL & FILTER CHANGE | 17,334 |

CUSTOMER ACCOUNT NUMBER
CHICAGOLAND DEALER
1234 STATE STREET
CHICAGO, IL 60601

### REPAIR ORDER ANALYSIS

THE FOLLOWING LIST OF SERVICES AND TOTALS REFLECT THE MOST RECENT GROUP OF REPAIR ORDERS THE WE PROCESSED.

WE ARE ONLY ABLE TO PROCESS REPAIR ORDERS THAT ARE LEGIBLE AND CONTAIN THE CUSTOMERS NAME, ADDRESS, CITY, STATE, ZIP & PHONE ALONG WITH THE MAKE AND YEAR OF THE CAR.

| | |
|---|---|
| LUBE, OIL & FILTER CHANGE | 155 |
| TRANSMISSION FLUID CHANGE | 1 |
| ENGINE TUNE-UP | 73 |
| TIRE ROTATION & BALANCE | 11 |
| WHEEL ALIGNMENT | 12 |
| BRAKE SAFETY CHECK | 40 |
| SHOCKS / STRUTS CHECK | 7 |
| MUFFLER & EXHAUST CHECK | 15 |
| AIR CONDITIONING MAINTENANCE | 3 |
| ENGINE COOLANT CHECK-UP | 4 |
| TIRE REPLACEMENT | 5 |