**MICROBIX BIOSYSTEMS, INC. Plaintiff**

v.

**BIOWHITTAKER, INC., et al. Defendants**

**Abbott Laboratories Counterclaimant**

v.

**Microbix Biosystems, Inc. Counterclaim–Defendant**

No. MJG–97–2525.

United States District Court, D. Maryland.

March 28, 2000.

Joseph D. Edmondson, Jr., J. Mark Waxman, John P. Isaacson, Foley and Lardner, Washington, DC, Daniel A. Small, Michael D. Hausfeld, Matthew F. Pawa, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Agnieszka Fryszman, Law Office, Washington, DC, Ann C. Yahner, Law Office, Washington, DC, for Plaintiff.

John Henry Lewin, Jr., Maria F. Howell, Jennifer M. Horn, Venable, Baetjer & Howard, Baltimore, MD, Peter Thauer, East Rutherford, NJ, for Defendants.

Robert P. Schlenger, Lord & Whip, Baltimore, MD, David M. Rosenzweig, Jeffrey I. Weinberger, Munger, Tolles & Olson, Los Angeles, CA, Kenneth D. Greisman, Nicholas A. Poulos, Abbott Laboratories, Abbott Park, IL, for Abbott Laboratories.

**1.** Abbott and BioWhittaker have moved for summary judgment on the antitrust claims (First and Second Causes of Action of the First Amended Complaint) pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"). The Court shall resolve that motion separately.

## MEMORANDUM AND ORDER RE COUNTERCLAIMS

GARBIS, District Judge.

The Court has before it Counterclaim–Defendant's Motion for Summary Judgment. The matter has been fully briefed. The Court has considered the materials submitted by the parties, held a hearing, and had the benefit of counsel's arguments.

## I. BACKGROUND

### A. Procedural History

This counterclaim, brought by Abbott Laboratories, Inc. ("Counterclaimant" or "Abbott") against Microbix Biosystems, Inc. ("Counterclaim–Defendant" or "Microbix"), alleges violation of the Illinois Trade Secrets Act, Ill. Comp. Stat. Ann. § 1065/1–9 ("ITSA") (West 1999).

On August 6, 1997, Microbix sued BioWhittaker, Inc. and BioWhittaker Holdings, Inc. (collectively "BioWhittaker"), alleging antitrust and common-law violations. On June 16, 1998, Microbix filed the First Amended Complaint, alleging the following claims against BioWhittaker and Abbott: [1]

| Cause of Action | Claim | Defendant(s) |
|---|---|---|
| First | Violation of Section 1, Sherman Act | BioWhittaker & Abbott |
| Second | Violation of Section 2, Sherman Act | BioWhittaker & Abbott |
| Third | Misrepresentation | BioWhittaker [2] |
| Fourth | Promissory Estoppel | BioWhittaker |
| Fifth | Declaratory Relief | BioWhittaker |
| Sixth | Interference With Economic Relationships | Abbott |

On August 12, 1998, Abbott counterclaimed against Microbix for (1) theft of trade secrets, (2) unfair competition, and

**2.** The Court has severed the claims made only against BioWhittaker (the Third, Fourth, and Fifth Causes of Action of the First Amended Complaint).

(3) tortious interference with contracts. On September 30, 1999, the Court dismissed with prejudice the unfair competition and tortious interference counterclaims.[3] In the remaining counterclaim, Abbott claims that a former Abbott employee, Dr. Ronald Duff ("Duff"),[4] disclosed Abbott trade secrets to Microbix in the course of performing consulting work for Microbix, and that Microbix used such trade secrets in developing a generic urokinase which would compete with Abbott's urokinase.[5]

Microbix now moves for summary judgment on the theft of trade secrets counterclaim.

### B. Trade Secrets Microbix Allegedly Misappropriated and Used

In the counterclaim, Abbott alleges that Duff disclosed to Microbix the following ten trade secrets which Microbix used to obtain partners and funding and to conduct initial research and development:

- *No. 1:* Procedures and specifications for testing and acceptance of human neonatal kidney ("HNK") cells;
- *No. 2:* Information concerning urokinase yields;
- *No. 3:* Abbott's use of aminosol in production media;
- *No. 4:* Abbott's use of newborn calf serum in place of fetal calf serum;
- *No. 5:* Details regarding use of bovine embryo extract ("BEE");
- *No. 6:* Information concerning Abbott's lack of success with HEPES (a pH regulator);
- *No. 7:* Information regarding Abbott's lack of success with trypsin-EDTA;
- *No. 8:* Information about Abbott's cost of producing urokinase;
- *No. 9:* Percentage of recovery of urokinase in the purification process; and
- *No. 10:* Abbott's use of rework to remove endotoxins.[6]

Abbott Opp. at 5–11. Microbix contends that the information at issue does not include "trade secrets" because:

1. It is publicly available or generally known within the industry;

2. Information concerning various aspects of urokinase production has been published in numerous documents, including three expired patents on urokinase production, the summary basis for approval of Abbokinase, and scientific publications by Abbott scientists;

3. Microbix conducted experiments to develop its own urokinase procedures; and

4. Duff had acquired expertise in tissue culture relevant to urokinase production prior to being employed at Abbott.

### 1. Abbott's Expired Patents

Abbott held three patents on urokinase production that expired in 1994 and became publicly available: (a) United States

---

3. The parties agree that the unfair competition and tortious interference counterclaims are preempted by ITSA, upon which the theft of trade secrets counterclaim rests. *See* 765 Ill. Comp. Stat. Ann. 1065/8 (West 1999).

4. Duff worked as head of the viral and cell biology groups in the experimental biology division of Abbott from 1974 to 1983.

5. Urokinase is a broad category of thrombolytics used for treating clinical conditions caused by blood clots. At all times relevant hereto, Microbix attempted to develop, obtain government's approval for, and market a generic urokinase to be marketed under the trade name ThromboClear that would compete with Abbokinase (Abbott's urokinase).

6. Abbott initially alleged that Duff had disclosed to Microbix the percentage purity of the urokinase product that could be obtained after purification of the bulk drug. However, Abbott dropped this allegation in its Opposition.

Patent No. 3,930,944, January 6, 1976 ("the '944 Patent"); (2) United States Patent No. 3,930,945, January 6, 1976 ("the '945 Patent"); and United States Patent No. 3,957,582, May 18, 1976 ("the '582 Patent").

### a. The '944 Patent

The '944 Patent disclosure discusses the addition of a chemical called pronase to the urokinase-production medium. The patent describes the need to increase urokinase yields from kidney cell cultures to make commercially feasible volumes, setting forth the following process for culturing cells:

> Human embryonic kidney cells grown in .75 mm. Falcon flasks are planted at 5 $\times 10^5$ cells in 40 ml. of the nutrient medium consisting of Parker's medium, described in Grand Island's Biological catalog (GIBCO) and containing $1 \times$ BME (basal minimal essential vitamins and amino acids, described ibid.) as well as 10% by volume of fetal calf serum. The flasks are incubated at 37˚C in a closed system after gassing them with carbon dioxide to a pH of 7.2. When confluency or a contiguous monolayer of the cells is obtained, the cells are washed with a 0.8% aqueous NaCL solution buffered with phosphate to a pH of 7.4.
>
> The wash liquor is now replaced by the maintenance medium consisting of 0.5 weight % of lactalbumin hydrolysate, 0.1 weight % of human serum albumin, 0.6 weight % of glycine, and 0.18 weight % of glucose in 0.8% of Earle's balanced salt solution containing 0.8 g/lt. of sodium bicarbonate. In the test samples, pronase is added to this medium at the beginning of the urokinase production cycle and samples are taken at various intervals. The results obtained are listed as urokinase titers per ml. on the days indicated in Table I.

> \* \* \* \* \* \*

> As pointed out above, best results are obtained when a contiguous monolayered structure of cells adhered to a solid surface is used for the production of urokinase. Such monolayered structures have been used by earlier investigators and have been described in the literature. Optimum temperature for the above process of producing urokinase is 37˚C. ± 0.5; at temperatures below this range, urokinase production is slower than what can be achieved and at temperatures above the range indicated, the danger of damaging the cells which produce the urokinase is increased to the point where production is jeopardized.
>
> As will be recognized by those skilled in the art of maintaining live cells in an nutrient medium, the above-demonstrated beneficial effect can be achieved with any kind of nutrient medium used for kidney cells. Such media may contain various proportions of minerals and/or vitamins, buffers, etc. and various concentrations of ingredients such as the commonly used Earle's balanced salt solution, sodium bicarbonate and other additives commonly used for nutrients for the above purpose.

Microbix Ex. 3., '944 Patent Col. 2, lines 36–60; Col. 4 lines 9–31.

The '944 Patent further states that "[o]rdinarily, after about 4–5 weeks, the culture has produced a commercial optimum of urokinase." *Id.* Col. 2, lines 24–25. Two tables, set forth in the patent, show the quantities of urokinase, expressed in international units of urokinase per milliliter of production medium ("IU/ml"), obtained at various time intervals during the culture process. *Id.* Col. 2, lines 61–68; Col. 3 lines 15–22. The patent concludes that the optimal amount of pronase to add to the production medium is in the range of 0.06

and 0.5 micrograms per milliliter. *Id.* Col. 4, lines 33–39.

### b. *The '945 Patent*

The '945 Patent discloses a procedure similar to that presented in the '944 Patent for producing urokinase from embryonic kidney cells and concludes that the addition of between 0.3 and 1.2 percent glycine to the production medium significantly increases the quantity of urokinase obtained. Microbix Ex. 4, '945 Patent Col. 1, lines 38–41. Tables in the '945 Patent provide detailed information on the yields obtained under various conditions at various intervals of culture time. *Id.* Col. 2, lines 57–68; Col. 3, lines 16–35; Col. 4, lines 1–9.

### c. *The '582 Patent*

The '582 Patent discloses a detailed description of a urokinase purification method that yields a purity of between 55,000 and 64,000 CTA[7] units/mg. *See* Microbix Ex. 5, '582 Patent Col. 3, lines 5–6; Col. 4, lines 3–4. The minimum purity for medicinal use is 35,000 CTA units/mg. *Id.* Col. 3, lines 9–10.

### 2. *"Summary Basis For Approval" of Abbokinase*

As part of the FDA regulatory approval process, Abbott submitted a "Summary Basis For Approval" ("the Summary") pertaining to the Abbokinase manufacturing process. This document, publicly available, discloses the following aspects of Abbott's manufacturing process:

- the passaging of cells in a growth medium containing fetal bovine serum;
- the use of roller bottles (as opposed to another type of vessel) in the growth process;
- the temperature of the growth environment;
- the growing of the cells to confluency, purification by ion exchange chromatography, and gel filtration;
- the length of time and temperature for heat treatment following purification; and
- the constituents of the final preparation.

*See* Microbix Ex. 6 at GS 31211–31224.

### 3. *Scientific Publications*

Abbott scientists have published papers relating to the manufacture of urokinase from kidney cells. For example, in *Plasminogen Activator From Human Embryonic Kidney Cell Cultures* (Nolan, Hall, Barlow and Tribby, 1976), Abbott scientists describe the cell culture process as follows:

> [Kidney] cells were grown to confluency in medium E–199[8] containing 10% fetal bovine serum in plastic culture flasks with 25 or 75 $cm^2$ growth surfaces and then maintained in a serum-free medium for plasminogen activator production as previously described [16, 17].[9] The culturing times indicated refer to the time periods that the cells were maintained in a lactalbumin hydrolysate [production] medium.

---

7. The measurement is established by the Committee on Thrombolytic Agents ("CTA").

8. Medium E–199 is a common off-the-self medium also referred to as Eagle's medium 199 or "M–199."

9. The reference to notes 16 and 17 in the quotation identifies two more publications by Abbott scientists that set forth a urokinase production medium and other information regarding urokinase production. *See* Microbix Ex. 8, *Thrombopoietin Production by Human Embryonic Kidney Cells in Culture* (McDonald, et al.1975), MBX 010996—011003; Microbix Ex. 9, *Proteases in Biological Control: Production of Plasminogen Activator by Tissue Culture Techniques* (Barlow, Reuter & Tribby, Cold Spring Harbor, 1975).

Microbix Ex. 7 (MBX023122–38) at 24. Table III of the publication discloses the yields obtained at various intervals during the cell-culture process, the highest yield being 1950 urokinase units per milliliter at 35 days. *Id.* at MBX023131.

Another publication discloses the urokinase yields of subcultures one through ten at various time intervals; the table containing this information (Table 1) exhibits a drop in urokinase secretion commencing at subculture four. Microbix Ex. 9, *Proteases in Biological Control: Production of Plasminogen Activator by Tissue Culture Techniques* (Barlow, Reuter & Tribby, Cold Spring Harbor, 1975), at MBX 023231. Another table (Table 4) of the same publication discloses urokinase yields from 830 IU/ml to 1664 IU/ml when the cultures are seeded with urokinase to create a feedback loop. *Id.* at 023233.

An additional article published by Abbott scientists discloses the use of bovine embryo extract ("BEE"), a common addictive to culture media, in growth media for urokinase. *See* Microbix Ex. 10 (The Matrix Metalloproteinase Pump—1 Catalyzes Formation of Low Molecular Weight (Pro) Urokinase in Cultures of Normal Human Kidney Cells (Marcotte, et al.1992) at MBX 023184.[10] A publication by Dr. Lewis, inventor of one of the urokinase patents now assigned to Abbott,[11] also addresses the production of urokinase from kidney cells. *See, e.g.,* Microbix Ex. 12, Plasminogen Activator (Urokinase) From Culture Cells (Lewis, 1979) ("cultures can be serially passed three to four times without changes in karyology [genetic structure] thus increasing by 9 to 10 fold the number of cells available for the synthesis of the enzyme.")).

In June 1996, Abbott scientists presented three papers at a symposium on *in vitro* biology. Abstracts of these papers disclose

- the use of roller bottles in Abbott's commercial production;

- the effects of epidermal growth factor ("EGF") on kidney cell growth;

- the use of Medium 199 as a base;

- the addition of either 8 percent or 10 percent fetal bovine serum (also known as fetal calf serum) to the growth medium;

- the addition of a 1 percent concentration of BEE in the growth medium; and

- the beneficial effect of the addition of zinc sulfate to the production medium.

*See* Microbix Ex. 13 (In Vitro Abstracts).

### 4. *Microbix's Own Experiments*

Microbix conducted four years of experiments (from 1994 to 1998) to develop unique procedures for urokinase production. Beginning in November 1994, Microbix started a series of experiments. *See* Microbix Mem. at 12–15 and the exhibits cited therein. Microbix conducted (1) some seventy experiments on culture media from June 1995 through the fall of 1997, (2) over one-hundred and forty experiments on urokinase purification from April 1996 through December 1998, (3) eight experiments on urokinase scale-up from October 1996 through February 1997, (4) five experiments on urokinase manufacture from December 1996 through June 1997, and (5) thirty-nine experiments on urokinase viral validation from November 1997 through December 1998. *Id.*

---

**10.** Other papers published by Abbott scientists relating to the production of urokinase from kidney cell cultures are attached to Microbix Memorandum as exhibit 11 to Microbix's Motion for Summary Judgment.

**11.** Dr. Lewis is the inventor of the '945 Patent, now assigned to Abbott, and works at the Cleveland Clinic Foundation, which is known to work closely with Abbott.

## 5. *Duff's Expertise*

Prior to working at Abbott, Duff was a Postdoctoral Fellow at the Baylor School of Medicine (specializing in virology and epidemiology) from 1968 to 1969, and then an Associate Professor in microbiology at the Milton S. Hershey Medical School ("Hershey") from 1969 to 1974. At Hershey, Duff specialized in virology and cell biology. In that capacity, he conducted experiments on tissue cell culture. Moreover, as a Postdoctoral Fellow and Associate Professor, Duff published various papers concerning the process of culturing cells. Duff then worked at Abbott from 1974 to 1983 as head of the viral and cell biology groups in the experimental biology division of Abbott.

## II. *LEGAL STANDARD*

A motion for summary judgment shall be granted if the pleadings and supporting documents "show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The well-established principles pertinent to such motions can be distilled to a simple statement.

The Court must look at the evidence presented in regard to the motion for summary judgment through the non-movant's rose colored glasses, but must view it realistically. After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991).

## III. *DISCUSSION*

■ Abbott alleges that Microbix misappropriated and used Abbott's trade secrets in violation of the Illinois[12] Trade Secret Act ("ITSA"), Ill. Comp. Stat. Ann. § 1065/1–9. Abbott's Opp. 18–35. A plaintiff seeking damages under ITSA must show (1) secrecy, (2) misappropriation, and (3) use of the trade information at issue. *Composite Marine Propellers v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir.1992); *Computer Care v. Service Systems Enterprises, Inc.*, 982 F.2d 1063 (7th Cir.1992). Microbix contends that Abbott has not presented evidence adequate to establish the "secrecy" and "use" elements.[13]

### A. *Secrecy of Trade Information*

Abbott alleges that the information which Duff disclosed to Microbix includes trade secrets. The ITSA defines a "trade secret" as

information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

Ill. Comp. Stat. Ann. § 1065/2(d). Microbix does not challenge the sufficiency of Abbott's efforts to protect the secrecy of

---

12. The parties agree that Illinois law applies to the counterclaim.

13. Microbix does not challenge the "misappropriation" element. Microbix Reply at 1.

its information under subsection 1065/2(d)(2) of ITSA. *See* Microbix Reply at 21.

■ As to the secrecy requirement of subsection 1065/2(d)(1) of ITSA, Abbott must prove that the trade information at issue (a) is sufficiently secret to derive economic value, (b) is not within the realm of general skills and knowledge of the relevant industry, and (c) cannot be readily duplicated without involving considerable time, effort or expense.[14]

### B. *Use of Information*

It is undisputed that Microbix's current procedures for urokinase production are distinct from those of Abbott. That is, there is no evidence, and indeed Abbott has not alleged, that Microbix's procedures contain any Abbott's trade secrets. Abbott alleges only that Microbix "exploited" the alleged trade secrets to (1) obtain funding and partners[15] and (2) conduct initial research and development. However, for purposes of this motion, Abbott must present evidence to show that each piece of trade information allegedly disclosed by Duff to Microbix is a "trade secret" and that the information was actually used in Microbix's business.

■ Moreover, the Court notes a possible threshold problem with Abbott's trade secret counterclaim that could render an analysis of the claim in detail a moot exercise. The undisputable fact is that Microbix never produced its planned product and, on the evidence, has no reasonable prospect of doing so in the future. Accordingly, even if Microbix had used Abbott's trade secrets in its attempts to develop a product, there is no evidence, or conceivable evidence, of any possible damages to Abbott resulting from the use. Nor is there any threatened use or disclosure warranting injunctive relief.

---

**14.** *Computer Care,* 982 F.2d at 1064–66; *Composite Marine Propellers,* 962 F.2d at 1265–66; *Pope v. Alberto–Culver Co.,* 296 Ill.App.3d 512, 230 Ill.Dec. 646, 694 N.E.2d 615, 617–18 (1998) ("It is well-established that a product or service that is within the realm of general skills and knowledge in the industry cannot be a trade secret."); *Service Centers of Chicago, Inc. v. Minogue,* 180 Ill.App.3d 447, 129 Ill.Dec. 367, 535 N.E.2d 1132, 1136–37 (1989) ("[P]laintiff has failed to show that the information underlying these 'rules of thumb' was not generally known in the medical records storage industry.").

**15.** Abbott relies on two Texas cases, applying Texas law, that do not hold that obtaining funding and business partners constitutes use in the absence of actual use. In *Garth v. Staktek Corp.,* 876 S.W.2d 545, 548 (Tex.App. 1994), there had been a finding that the defendant "had used [plaintiff's] trade secrets to develop its competing product." In *Atlantic Richfield Co. v. Misty Products, Inc.,* 820 S.W.2d 414, 422 (Tex.App.1991), the court rejected a trade secret allegation where there was no evidence that the individuals who had received allegedly secret financial data "were in any way involved in [defendant's] decision to develop" and market a competing product and the record showed that the technical employees "were unable to decipher" an allegedly secret formula. *Id.* Thus, even if Texas law were applicable to this case, it would not permit a finding of use where the information at issue was never used in the competitor's product or processes. *See also Affiliated Hosp. Products, Inc. v. Baldwin,* 57 Ill.App.3d 800, 15 Ill.Dec. 528, 373 N.E.2d 1000, 1002–03, 1005 (1978) (defendant "admittedly used the drawings as a reference" to complete a design of the machine; defendant's design work took eight to ten weeks whereas plaintiff had undertaken five years of experimentation, defendant's design engineer had never even seen such a machine prior to reviewing plaintiff's drawings, and experts agree that the two machines were similar).

Moreover, the "trade secrets" allegedly used in the Elkins Sinn feasibility report did not enable Microbix to obtain Elkins Sinn as a partner, and Abbott does not allege that Microbix has used the same information to attract Gensia Laboratories, Ltd., to join the project.

Finally, the Court finds unpersuasive Abbott's "one size fits all" argument that the fact that Abbott, without disclosing it, uses generally known information is itself a trade secret.

### 1. Procedures and Specifications for Testing and Acceptance of HNK Cells

#### a. Secrecy

Abbott alleges that Duff provided to Microbix an Abbott document describing protocols for the processing and screening of HNK cells for potential use in the production of urokinase, and that Abbott has not publicly disclosed the document.[16] Abbott's Opp. at 18–19; Long Decl. at ¶ 17; Abbott Ex. 20; Microbix Ex. 38. Abbott appears to focus on page MBX003145 of the document, which contains the specifications for minimum urokinase yields [17] for a lot of cells to be accepted for use in urokinase production. This page consists of a chart which states that (1) with respect to subculture three at week four, "must assay at least 475 units/ml or reject lot"; (2) with respect to subculture three at week five, "must assay at least 760 units/ml or reject lot"; and (3) with respect to both subcultures three and four at six weeks, "must assay at least 1100 units/ml or reject lot." Id.

As noted above, Abbott alleges that it has not publicly disclosed the document. However, Abbott has not alleged (or presented any evidence to show) that the information contained in the document (namely, the specifications on page MBX003145) is not generally known in the industry. Duff testified that the document contains information that he originally wrote as a graduate student and as a professor at Hershey. Microbix Mem. at

25; Microbix Ex. 14 at 267–68 (Duff Depo.). Specifically, Duff testified that he derived the specifications at issue from the 1975 and 1977 scientific papers published by Abbott scientists ("the Barlow Publications"). See Microbix Ex. 14 (Duff Depo.) at 196–98.

The Barlow Publications provided figures that are similar to the ones contained on page MBX003145. For example, Table 4 of the 1975 Barlow Publication discloses a yield of 1101 IU/ml at 35 days for a cell lot when following the procedure of seeding the cultures with urokinase to create a feedback loop. See Microbix Ex. 9 at MBX023233. The 1975 Barlow Publication also reports other values ranging from 830 to 1664 IU/ml. Id. Table 5 of the publication discloses a yield of 480 at 28 days. Id. at MBX023234. Moreover, Table 1 of the publication discloses a yield of 760 at 37 days in subculture 4. Therefore, it appears that the specifications at issue, though not identical to those published in the Barlow Publications, are generally known in the industry.

Abbott attempts to obfuscate the issue by focusing on the alleged differences between its commercial processes and the experimental conditions in the Barlow Publications, which disclose information that Abbott claims is not "exactly" the same as that contained in the unpublished Abbott document. See Abbott's Opp. at 20. However, as a matter of common sense, generally known information need not be *exactly* the same as the alleged trade secret. If, as here, there is no substantial difference between the alleged trade secret and what is generally known, there is no protectible trade secret.

---

16. The document, attached as Exhibit 20 to Abbott's Opposition at MBX003138–60, apparently was developed by Duff while he was working at Abbott.

17. This is the amount of urokinase that a cell line must produce to be used in commercial urokinase production.

The Court concludes that, on the evidence, no reasonable jury could find the subject information secret rather than generally known in the industry.[18]

### b. *Use*

Use of the information is moot in light of the ruling as to secrecy. Nevertheless, it should be noted that Abbott does not allege that either Abbott or Microbix has ever used the data from page MBX003145 as their *actual* specifications. To the contrary, *none* of the specifications from page MBX003145 appear anywhere in Microbix's procedures.[19]

### 2. *Information Concerning Urokinase Yields*

■ Abbott alleges that in a feasibility study report, Microbix stated that "[w]e have reason to believe that levels [of urokinase production as] high as 2000 IU/ml are routinely achieved at Abbott." Abbott Opp. at 21; Microbix Ex. 40 at MBX 003193. Abbott further alleges that Microbix derived this information from a conversation with Duff. Abbott Opp. at 21; Abbott Ex. 3 at 168. Microbix contends that this information cannot constitute a trade secret because Abbott had previously disclosed publicly the fact that it had obtained yields equivalent to 2000 IU/ml from its commercial manufacturing process. Microbix Mem. at 30.

There is an Abbott publication disclosing levels of urokinase production as high as 1950 IU/ml. *See* Microbix Ex. 28 at ¶¶ 49, 52 (citing publication). Because the 1950 IU/ml figure is publicly known, it is not a stretch to conclude that the levels of urokinase production can be approximately 2000 IU/ml.[20] In other words, as a *general* knowledge, there appears to be no significant difference between the 2000 IU/ml figure and the 1950 IU/ml figure.

Abbott argues that Microbix offers no evidence that the 1950 IU/ml figure in the article bears any relation to Abbott's 2000

---

**18.** Abbott's expert claims only that the specifications on page MBX003145 "is clearly something Abbott would have considered confidential." Abbott Ex. 29 at 5. Moreover, Abbott does not dispute Microbix's evidence (taken from Abbott's manufacturing instructions) that Abbott itself never used any of the information (including the 1100 IU/ml figure contained in the document at issue) in its commercial production. Dr. Long only makes the conclusory statement that later specifications used by Abbott are "analogous" to those on page MBX003145 and never offers any objective corroboration of this point. Long Decl. at ¶ 15. Abbott has the burden of coming forward with evidence sufficient to generate an issue of material fact. No such evidence has been presented.

**19.** For example, Microbix's specification in years 1989, 1987, 1982, and 1979 is "[n]ot less than 800 IU/ml in at least 45 days." Microbix Ex. 50 at A023726, A023791, A023805, A023817, and A023843. As of April 1978, the specification was "[n]ot less than 800 IU/ml in 40 to 45 days." *Id.* at A023856. As of January 1978, Microbix's specification was "[n]ot less than 1300 IU/ml in 40 to 45

days." *Id.* at 023858. In 1977, the specification was "[n]ot less than 400 IU/ml in not more than 45 days (FDA limit)" and "[n]ot less than 500 IU/ml in not more than 45 days (Internal Control)." *Id.* at A023869.

**20.** Dr. Schwartz (Microbix's expert) testified that the publication disclosing 1950 IU/ml is a relevant disclosure "essentially equivalent" to 2000 IU/ml for cell culture purposes. Microbix Ex. 28 at ¶¶ 49, 52 (citing publication). However, Abbott objects to Microbix's expert's (Dr. Schwartz's) report as unsworn even though the copy introduced by Microbix bears evidence that it was introduced as an exhibit to his deposition. *See* Abbott Opp. at 16; Microbix Ex. 28. In any event, Microbix is now permitted to cure any inadmissibility by submitting the declaration from Dr. Schwartz (attached as exhibit 63 to Microbix Reply). *See* Microbix Ex. 63; *see also Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir.1989) (party may cure any alleged inadmissibility by attaching the report to an affidavit from the expert or by deposition testimony).

yield, apparently contending that the 2000 IU/ml number provided Microbix with a specific goal. Abbott Opp. at 21. However, Abbott does not come forward with any evidence that Microbix uses the 2000 IU/ml figure as a benchmark. To the contrary, as late as February 1998, Microbix Vice–President Kevin Cassidy proposed a urokinase production scheme based on 1200 IU/ml and identified 1500 IU/ml as the next goal. Microbix Ex. 28 (Expert Report of Dr. Alan Schwartz) at ¶ 51. Moreover, Abbott makes no attempt to show that it does "routinely" achieve 2000 IU/ml.

The Court concludes that even viewing the facts in the light most favorable to Abbott (the non-movant), no fact finder could reasonably conclude that the 2000 IU/ml figure is a trade secret.

### 3. Abbott's Use of Aminosol in Production Media

#### a. Secrecy

■ Abbott alleges that Duff disclosed the fact that Abbott uses the media ingredient called aminosol in place of the publicly-disclosed lactalbumin hydrolysate. Abbott Opp. at 22; Ex. 25 at MBX 003134; Ex. 24 at MBX 016579; Ex. 26. Microbix does not dispute that the information concerning aminosol is a trade secret.

#### b. Use

There is no evidence that Microbix has ever used aminosol. It appears that Duff did not sufficiently describe aminosol to Microbix for the company to identify the source of aminosol. Microbix Ex. 16 (Cassidy Depo.) at 128 (Microbix "has never been able to identify a source of amino-

sol"); Microbix Ex. 18 (Hughes Depo.) at 24; Microbix Ex. 29 (Hay Depo.) at 6, 82–85. If so, the allegation concerning the disclosure of aminosol is irrelevant to this case. See Microbix Ex. 28 (Schwartz Report) at ¶ 54 (confirming that Microbix has never used aminosol and instead used lactalbumin hydrolysate). In short, even if this information were a trade secret, the information has no relevance unless Abbott also shows that Microbix used the information.[21]

The Court concludes that Abbott has not presented evidence adequate to enable a reasonable fact finder to conclude that the information concerning aminosol was used by Microbix.

### 4. Use of Newborn Calf Serum in Place of Fetal Calf Serum

■ Abbott alleges that Duff disclosed to Microbix that, as part of Abbott's manufacturing protocols, Abbott substitutes newborn calf serum for fetal calf serum as a media supplement during the last passage of the cell growth phase, and that Abbott has not disclosed publicly this information. Abbott Opp. at 22; Long Decl. ¶ 25; Ex. 35 at A022908–24.

It appears that a switch from fetal calf serum to newborn calf serum was an obvious cost-saving measure generally known in the industry. Microbix Ex. 28 at ¶¶ 56–59 (citing a similar switch published in a scientific journal). Abbott seeks to introduce "evidence" that this information is non-public by submitting a conclusory and self-serving affidavit from Dr. Long with no objective corroboration of his claim. Long Decl. at ¶ 25. In any event, Dr.

---

**21.** Abbott alleges that it found aminosol, which is manufactured by a division of Abbott, to be more effective and consistent at promoting the production of urokinase than lactalbumin hydrolysate. Abbott Opp. at 22; Long Decl. at ¶¶ 23–24. Abbott further alleg-

es that since the late 1970s, it has used aminosol (or "protein hydrolysate") exclusively, in place of lactalbumin hydrolystate. Abbott Opp. at 22; Long Decl. ¶ 23; Ex. 34 at A023439–44. However, nowhere does Abbott allege that *Microbix* used aminosol.

Long states only that Abbott has not publicly disclosed its own practice in this regard, but not that the practice is not generally known in the industry. The other expert testimony offered by Abbott does not contend this information is non-public but only discusses the potential benefits of calf serum. Microbix Ex. 30 (Expert Report of Dr. Hay) at 6.

The Court concludes that Abbott's expert's conclusory, factually unsupported statement concerning this information does not meet the requirement of Rule 56(e)[22] and, therefore, cannot defeat summary judgment.

### 5. Details Regarding Use of BEE

■ Abbott alleges that Duff disclosed to Microbix the fact that Abbott uses bovine embryo extract ("BEE") in its Abbokinase media. Abbott Opp. at 23, Ex. 4 at 106–07. Abbott also alleges that through Duff, Microbix learned that although BEE did not increase the growth of HNK cells, it did increase the amount of urokinase that the cells produce during the manufacturing phase. Abbott Opp. at 23, Ex. 25 at MBX 003136; Ex. 24 at MBX 0016581.

The evidence reflects that Abbott itself twice published its use of BEE in connection with the production of urokinase from HNK cells, and that in the publications Abbott disclosed a one percent concentration of BEE in HNK cell growth medium. *See* Microbix Ex. 10 at MBX023184; Microbix Ex. 13 at 53A, 57A; Microbix Ex. 18 at 48. Moreover, Abbott never disputes that Duff learned about BEE at two academic institutions prior to his employment with Abbott. Thus, the knowledge about BEE appears to be generally known in the industry. Abbott's conclusory allegation that Duff disclosed the purpose and effect of using BEE is insufficient to create a genuine issue of material fact concerning the "secrecy" of the information.

### 6. Information Concerning Abbott's Lack of Success With HEPES

Abbott alleges that Duff disclosed to Microbix the fact that Abbott had "not had success" in using HEPES[23] to control pH conditions in Abbott's urokinase media and, therefore, Abbott developed other solutions to regulate pH. Abbott Opp. at 24. Abbott further alleges that Abbott has not "publicly disclosed its experience with HEPES in connection with HNK-based urokinase." *Id.*

A textbook on cell culture advises against using HEPES because it has been found to limit cell growth and is expensive in large-scale applications. *See* Microbix Ex. 2, R. Ian Freshney, *Culture of Animal Cells: A Manual of Basic Technique,* (3rd ed.1994), at 81–82, 85. Further, Abbott disclosed in its expired patent that it used carbon dioxide, not HEPES, to control pH. Microbix Ex. 3 at MBX008097 ("The flasks are incubated at 37 degrees C in a closed system after gassing them with carbon dioxide to a pH of 7.2."). It is undisputed that Microbix has always used carbon dioxide, not HEPES, to control pH. *See* Microbix Ex. 18 at 74 ("The HEPES is an expensive organic buffer whose function is to control pH acidity, if that is required. In [Microbix's] case, control of acidity was

---

**22.** Abbott's expert evidence (Dr. Long's testimony) does not satisfy Rule 56(e) of the Federal Rules of Civil Procedure ("Rule 56(e)"). Rule 56(e) requires the party opposing a summary judgment to "set forth *specific facts*" establishing the presence of a genuine issue. Fed.R.Civ.P. 56(e) (emphasis added). Thus, expert affidavits or opinions must be based on specific facts. Stated differently, an expert's "naked opinions," though admissible at trial, may not suffice to defeat summary judgment. *See Mid–State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333 (7th Cir.1989).

**23.** HEPES is one of a number of buffers that can be used in cell culture to regulate the pH of culture media. Abbott Opp. at 24; Long Decl. ¶ 28.

never an issue. Therefore, the default position, and the default position for any base medium is not to have HEPES."). Thus, it appears that the information concerning HEPES is generally known in the industry.

Abbott's only evidence that the information is non-public is the declaration of Dr. Long offered with no factual corroboration. Long Decl. at ¶ 28. In any event, Dr. Long states only that Abbott never disclosed *its own* "experience with HEPES," not that the reasons not to use HEPES are generally unknown to the industry.

The Court concludes that the evidence presented does not permit a reasonable jury to find that the information concerning HEPES is a trade secret.

### 7. Information Regarding Abbott's Lack of Success With Trypsin–EDTA

■■■ Abbott alleges that "Dr. Duff revealed that Abbott has found that trypsin-EDTA was not effective for removing HNK cells from roller bottles." Abbott Opp. at 24. Abbott further alleges that Abbott has not publicly disclosed its use of trypsin (rather than trypsin-EDTA) in Abbokinase manufacturing. *Id.;* Long Decl. ¶ 29.

Abbott's allegations concerning the non-use of trypsin-EDTA appear to be groundless. Abbott, in essence, claims that Microbix benefitted from the information disclosed by Duff that trypsin-EDTA was not effective for removing HNK cells from roller bottles. However, it is undisputed

that Microbix uses *trypsin-EDTA* (not trypsin) to remove HNK cells from roller bottles. Abbott does not present any evidence to contradict the fact that Microbix performed its own experiments on trypsin versus trypsin-EDTA, concluded that trypsin-EDTA was superior given its interaction with the other constituents of Microbix's media formulation, and has used trypsin-EDTA ever since. In other words, Microbix used its own empirical scientific investigation to reach the *opposite* of what Duff allegedly recommended to Microbix through a disclosure of Abbott's trade secret.[24]

The Court concludes that based upon the evidence no reasonable fact finder could conclude that the information concerning non-use of trypsin-EDTA disclosed by Duff to Microbix is a trade secret.

### 8. Information About Abbott's Cost of Producing Urokinase

#### a. Secrecy

■■■ Abbott alleges that Duff disclosed to Microbix the fact that Abbott's cost of producing HNK cell-derived urokinase was $100 per million units, and that this financial information is a trade secret. Abbott Opp. at 24–25. Microbix contends that the figure provided by Duff was simply his estimate of the cost of urokinase production.

Abbott does not dispute that Microbix built its own cost structure. *See* Microbix Ex. 28 at ¶ 80; Ex. 55 at MBX000972–76;

---

24. Dr. Schwartz contends that there is no reasonable claim of secrecy with respect to the non-use of trypsin-EDTA. Abbott's expert (Dr. Hay) does not challenge this contention. Abbott Ex. 29 (Expert Report of Dr. Hay) at 9. Abbott, however, again relies upon a conclusory, self-serving statement from Dr. Long (Abbott's own employee) to suggest that Abbott in fact uses trypsin rather than trypsin-EDTA and that the non-use of trypsin-EDTA is

non-public. Long Decl. at ¶ 29. Dr. Long does not contend that this information is not generally known in the industry, but only that Abbott never disclosed its own non-use of trypsin-EDTA. In any event, as discussed above, the information concerning non-use of trypsin-EDTA is worthless in view of the fact that Microbix actually uses trypsin-EDTA contrary to Abbott's practice.

Ex. 56 at MBX–WS–00180–83. The only evidence produced by Abbott to contradict Microbix's expert and suggest that Duff was not providing an estimate is a statement from Dr. Long's declaration that $100 per million units was Abbott's cost basis. Long Decl. at ¶ 30. Dr. Schwartz (Microbix's expert) states that $100 per million units "is a reasonable extrapolation" from a "rule of thumb in the pharmaceutical industry . . . that products typically carry a gross margin of 90 percent." Microbix Ex. 28 (Expert Report of Dr. Schwartz) at ¶ 73. Dr. Hay (Abbott's expert) does not contest this testimony. However, Microbix has not presented any specific fact, other than the conclusory statement by its expert, that the financial information at issue is generally known in the industry.

Viewing the facts in the light most favorable to Abbott, the Court concludes that a fact finder could reasonably find that the information concerning Abbott's cost of urokinase production is a trade secret.

b. *Use*

Abbott admits that Microbix built its own cost structure for urokinase production. *See* Microbix Ex. 28 at ¶ 80; Ex. 55 at MBX000972–76; Ex. 56 at MBX–WS–00180–83. Knowing that Abbott's cost was $100 per million IU would be immaterial absent evidence that Microbix used the information to build its cost structure. There is no such evidence. Moreover, the "trade secret" of Abbott's production cost would be useless as a practical matter without sufficient detail to enable Microbix to know what costs were included or excluded from the figure. Long Decl. at ¶ 30; Ex. 28 at ¶¶ 74–76. In short, even if the cost information were found to be a trade secret, a reasonable jury could not find use of the information.

9. *Percentage of Recovery of Urokinase in the Purification Process*

 Abbott alleges that Duff disclosed to Microbix that Abbott recovered approximately 50% of the urokinase present in the bulk product after completion of Abbott's purification process. Abbott Opp. at 25. Abbott offers only a conclusory, unsubstantiated statement from Dr. Long's declaration to support its allegation that it actually recovers approximately 50 percent of the urokinase through its purification process. Long Decl. at ¶ 12. Moreover, Dr. Long never claims that this urokinase recovery rate is not generally known in the industry or, in this case, that Abbott has maintained the secrecy of its own recovery rate. Dr. Schwartz (Microbix's expert) states that information on the recovery of urokinase is in the public domain and cites as an example a published paper reporting a 59 percent urokinase recovery rate. Microbix Ex. 28 at ¶¶ 82, 84. Finally, Abbott does not dispute that Microbix designed its own purification system that is entirely distinct from Abbott's.

The Court concludes that the evidence presented does not permit a reasonable jury to find that the recovery percentage of urokinase during purification is a trade secret.

10. *Abbott's Use of Rework to Remove Endotoxins*

 Abbott alleges that Duff disclosed to Microbix that Abbott sometimes used rework to remove excess endotoxins, and that this information has not been disclosed publicly. Abbott Opp. at 26. Microbix disputes this allegation.

It appears that the technique of reworking urokinase to remove excess endotoxins is a common-sense method [25] and is, there-

---

**25.** Microbix correctly points out that the

practice "is tantamount to this: if the first

fore, not a trade secret. In other words, there is no evidence that this practice cannot be readily duplicated without involving considerable time, effort or expense. *See Computer Care,* 982 F.2d at 1064–66; *Composite Marine Propellers,* 962 F.2d at 1265–66. Abbott offers only the conclusory and self-serving declaration of Dr. Long that the use of rework to reduce endotoxins is not generally known in the industry. Long Decl. at ¶ 31. That declaration, however, is insufficient to create a genuine dispute of material fact.

The Court concludes that no reasonable fact finder could conclude that the information concerning the rework of urokinase to achieve better purification is a trade secret.

### IV. CONCLUSION

For the foregoing reasons:

1. Counterclaim–Defendant Microbix Biosystems, Inc.'s Motion for Summary Judgment is GRANTED.

2. Judgment shall be entered by separate Order.

purification run did not make [the urokinase] pure enough, do it again." Microbix Mem. at 38. Abbott cannot genuinely dispute that this practice is so complex that other non-Abbott scientists cannot undertake without first obtaining Abbott's "trade secret."